UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                 :
                 :

In the Matter of the Complaint of      :
                 :     **MEMORANDUM & ORDER**

THE CITY OF NEW YORK, as Owner  :
and Operator of the M/V ANDREW J. BARBERI  :     03-CV-6049 (ERK)
                 :
                 :

------------------------------------------------------------X

KORMAN, Chief Judge:

On the afternoon of October 15, 2003, the Staten Island Ferry *Andrew J. Barberi* (the "*Barberi*" or "Ferry") crashed into a maintenance pier near the Staten Island Ferry Terminal. The collision came without warning. The Ferry had been making its regularly scheduled trip from Whitehall Terminal, Manhattan, to St. George, Staten Island. Until only a few moments before the crash, nothing appeared to be out of the ordinary. The assistant captain, Richard Smith, who was at the controls in the pilothouse, was an experienced, licensed captain, and the crew had no reservations about his abilities. The weather, though very windy, was otherwise not a matter of concern. There were no signs of mechanical failure or impairment. And despite the fact that the *Barberi* had been off course before the accident occurred and was proceeding at full speed toward the Staten Island Ferry Terminal, the only evidence in the record that any crew member noticed that something was amiss is the affidavit of the deckhand, Joseph Selch, which stated:

> I was untying a door in preparation for docking, I looked up and saw that the ferry was proceeding past the slips and on what appeared to be a collision course with a nearby pier. I took immediate action to guide passengers away from the Staten Island end of the ferry. Moments later the ferry hit the pier.

Selch Aff. ¶ 8.

1

When the Ferry struck the maintenance pier, it was traveling at its full speed of 14 to 16 knots, or 16 to 18 miles per hour. The speed, however, does not convey the force of the impact. The *Barberi* weighs more than 3,000 tons, and its momentum was enough to destroy roughly 1,500 square feet of the maintenance pier and tear a 210-foot-long gash in the main deck of the boat. The passengers who happened to choose the port, or Brooklyn-facing, side of the vessel generally escaped injury. Those who awaited arrival on the starboard, or New Jersey-facing, side found themselves in grave danger. The impact with the pier shattered seats, tore metal, destroyed support stanchions, and collapsed a stairway and a bulkhead. The collision had an even more devastating effect on the passengers on that side; it instantly killed ten passengers and left scores of others with injuries that varied from minor to severe. One of the seriously injured passengers later died from injuries sustained in the crash.

This case was tried before me on the issue of liability. The trial without a jury was based on a record stipulated to by the City of New York and the plaintiffs who seek redress for their injury and loss. The record provides a reasonably clear picture of the events leading up to the collision. As the *Barberi* left Whitehall Terminal, Assistant Captain Smith was accompanied in the pilothouse by Selch, the deckhand who was the assigned lookout on the passage. Selch Aff. ¶ 4. Somewhere near the midpoint of the voyage, Senior Mate Robert Rush joined Smith and Selch in the pilothouse and took a seat on a low-slung bench near the rear of the pilothouse known as the "settee." Rush Aff. ¶¶ 8-9. Rush, however, had no assigned responsibilities in the pilothouse with respect to piloting the boat or serving as a lookout. Instead, he "had planned to ride out the balance of the 15:00 [minute] run in the Staten Island pilot house where [he] could organize [his] thoughts regarding [] various work orders and then proceed to the Saloon deck for docking." Id. ¶ 8. Moreover, the height and position of the settee made it impossible for him to

2

monitor the Ferry's position or to take notice of the circumstances leading up to the impending disaster.

As the *Barberi* passed the Kill Van Kull Buoy ("KV Buoy"), which is a little more than half of a mile from the St. George Terminal, Selch asked for and received Smith's permission to leave the pilothouse so that he could prepare the exit doors for docking. Selch Aff. ¶ 6. As Selch left the pilothouse, Smith stood up, as was his custom, apparently to better guide the *Barberi* into the ferry slip at the St. George Terminal. Id. ¶ 7. At this point things began to go wrong. Smith remembers nothing from the time Selch left the pilothouse until the moment when the *Barberi* collided with the maintenance dock. Rush, who was on the settee in the pilothouse throughout this period, noticed nothing unusual. Rush Aff. ¶¶ 11-13. He recalls that Smith stood at the controls, but did not notice anything amiss. Id. ¶¶ 11-12. In fact, however, Smith had lost conscious or situational awareness due to fatigue, a condition Dr. David Dinges, a sleep expert, described as follows:

> You lose your awareness of the time where you're at and time and space and what you're supposed to do next. You don't completely lose it in the sense that you don't know that you're on the water in a vessel or in a car or in a truck but you lose the sense of what you're supposed to do next in what timely order. And that is common as a result of fatigue.

Smith <u>Fatico</u> Hr'g Tr. 40:20-41:1, June 14, 2005. Smith remained in the state described by Dr. Dinges for approximately two minutes until the *Barberi* collided with the maintenance pier.

While Smith's condition posed a serious hazard, it would have presented no threat to the safety of the *Barberi*'s passengers had the boat's captain, Michael Gansas, been present with Smith in the pilothouse, as is required by the City's internal regulations. In fact, because it foresaw the possibility of pilot incapacitation, the City's rules required that the captain and the assistant captain both be in the pilothouse at all times while the Ferry was underway. This rule

could have easily been complied with on the *Barberi*, because there were two pilots on the vessel at all times. Instead, Captain Gansas spent the entire voyage in the aft, or Manhattan-facing, pilothouse. Had Gansas been present, the disaster would have been avoided.

It is not surprising that the Staten Island Ferry's rules were not followed given the haphazard way in which they were disseminated. At the time the accident occurred, the internal rules were neither well understood nor effectively enforced. The Staten Island Ferry had no formal safety management system. There was no single manual that was readily accessible to crew members. There was no mechanism to monitor who had received the procedures and at what time. And there was no system for ensuring that the rules were actually obeyed. Indeed, "there [were] no formal training programs at the Staten Island Ferry." Gansas Aff. ¶ 5. Instead, according to Captain Gansas, "there was 'on the job' training and the policies and procedures were passed down from the senior Captains and Assistant Captains" by word of mouth. Id.

The blame for this laxity lies squarely on the shoulders of the City. The New York City Department of Transportation (and its predecessor, the Department of Docks and Ferries) has operated the Staten Island Ferry for more than a century. For most of that time, it has had some form of standard operating procedures to govern the crew's behavior and to provide for the passengers' safety. By the time of the collision in this case, however, what was once a concise manual had apparently become a diffuse series of practices and procedures issued by the director of ferry operations. Rush Aff. ¶ 5. These directives were assembled in a handout that was never properly distributed. See Ryan Plea Allocution 53:17-25, Apr. 22, 2005. In his plea allocution in the related criminal case, Patrick Ryan, the City's director of ferry operations at the time of the accident, conceded that he knew that the Staten Island Ferry's Standard Operating Procedures ("SOP") were not being followed:

4

[W]hen I was the director of Staten Island Ferry operations, I understood . . . that the ferry service had a written rule that generally required the captain and assistant captain to be together in the operating pilot house while the [ferry was] underway.

A rule that served to insure passenger safety by providing for at least two people in the operating pilot house aware of the navigational situation.

I knew that this rule was not always being observed by all captains and assistant captains in good weather. I drafted revised Staten Island Ferry Standard Operating Procedures between 2001 and 2002 that restated this rule but did not take appropriate steps to insure – did not take adequate steps to insure that the ferry's captains and assistant captains received the new document, trained them on the rule nor insured that they were complying with it.

As a result, this rule was not followed at the time of the accident involving the Barberi on October 15, 2003 and no crew member noticed in time that the boat was far off course.

Id. 47:2-48:4. Subsequently, Ryan further stated:

Your Honor, I knew the rules [were not] followed. I took measures to insure [that they were]. I drafted those SOPs. I didn't adequately – I didn't get them out . . . the right way. I didn't train people in it. I didn't instruct people in it. I didn't get it dissimulated [sic] the right way. I never followed up and enforced that.

Id. 53:17-25.

Citing Ryan's failure to enforce the rule requiring that there be two pilots in the pilothouse at all times, the plaintiffs argue that the City's negligence caused the collision. While the City contests this argument and seeks to avoid any legal liability, it also argues that the Limitation of Vessel Owner's Liability Act (the "Act"), 46 U.S.C.A. § 30505 (2007) (formerly 46 U.S.C. § 183(a)), limits its liability to the value of the vessel, assessed at $14.4 million. Congress passed the Act in 1851 "to encourage ship-building and to induce capitalists to invest money in this branch of industry." Norwich Co. v. Wright, 80 U.S. (13 Wall.) 104, 121 (1872). This was necessary because:

Given the primitive vessels and the hazards of the sea, the potential common law liabilities of the shipowner as principal made the shipping industry an unattractive investment. Greater liability would result in greater cost. Leaving the United

> States shipowner without protection would put him at a competitive disadvantage
> in the world shipping market.

In re Complaint of Tracey, 608 F. Supp. 263, 266 (D. Mass. 1985).  The protection afforded by the Act only applies if the loss is "done, occasioned, or incurred, without the privity or knowledge of such owner."  46 U.S.C. § 183(a).  The Supreme Court has ruled that, when a ship is owned by a corporation, liability may not be limited "where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred."  Coryell v. Phipps, 317 U.S. 406, 408 (1943).  The parties agree that any negligence attributed to Ryan in his capacity as director of ferry operations is sufficient to defeat the City's effort to limit its liability to the value of the *Barberi*.  Thus, if Ryan's failure to enforce a two-pilot rule constituted causally related negligence, the City may not limit its liability.

## Discussion

Before turning to the principal issue, I first address the City's threshold argument that the two-pilot rule is an internal rule and such rules are not admissible as evidence when they provide for a standard of care higher than that set by law.  There are two problems with this position.  First, the Federal Rules of Evidence provide that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court . . . ."  Fed. R. Evid. 402.  There can be little doubt that the two-pilot rule is relevant for reasons that I discuss more fully below.  The rule reflects the City's recognition of the dangers of leaving one captain alone in the pilothouse.  Moreover, while not decisive of the issue whether the City was negligent, it is relevant to the analysis of legal issues relating to that determination.  See William L. Prosser, Law of Torts 168

(4th ed. 1971) (rule made by defendant to govern the conduct of its employees "may be used against him as indicating his knowledge of the risk and the precautions necessary to meet it"). In addition, while there are exceptions to the general rule that relevant evidence is admissible, see, e.g., Fed. R. Evid. 407 (excluding evidence of subsequent repairs), none of these exceptions apply here. Under the circumstances, it would be inappropriate, if not inconsistent with Federal Rule of Evidence 402, for me to exclude this relevant evidence on the grounds argued by the City.

This consideration aside, I do not find persuasive the City's argument that allowing internal rules into evidence will discourage employers from adopting safe practices. As one commentator has observed, "[w]hen a danger exists and the company knows or should know of it, the company must reckon with the possibility that the very failure to make rules may be used against it." John M. Winters, The Evidentiary Value of Defendant's Safety Rules in a Negligence Action, 38 Neb. L. Rev. 906, 932 (1959). A rational company, then, will be far more concerned with actually preventing accidents than with gaming future negligence actions by carefully crafting its safety manual. Indeed, in Bryan v. Southern Pacific Co., 79 Ariz. 253 (1955), the leading case in this area, the Supreme Court of Arizona rejected the argument that defendants now press:

> [W]e fail to understand why, as a practical matter, an employer will refuse to adopt such rules when by their adoption and enforcement the accident would not occur – at least through fault of the employer's servants. To us the more likely result will be that an employer will require a stricter adherence to his rules.

Id. at 260. This reasoning reflects the majority rule, adopted by roughly three-fourths of the courts that have considered the question. See C.R. McCorkle, Admissibility in Evidence of

Rules of Defendant in Action for Negligence, 50 A.L.R. 2d 16 § 3 (1956); see also Danbois v. N.Y. Cent. R.R. Co., 12 N.Y.2d 234, 239 (1963).

Federal Rule of Evidence 407, which excludes post-accident remedial measures, has been subject to similar criticism. While the premise underlying the rule is that the admission of such evidence will discourage such remedial measures, "[a]ny person who is competently advised [and hence aware of this rule] will know too that taking no action poses serious contervailing risks, since inaction in the face of a known danger increases the chance of liability to future claimants." 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence ch. 4, § 128, at 29 (2d ed. 1994). While I do not consider evidence of subsequent remedial measures taken by the City, I decline to adopt an exclusionary rule that is incompatible with the Federal Rules of Evidence.

The City contends that, even if its two-pilot rule is relevant and admissible, its "internal policy does not establish the appropriate standard of care and does not create duties to third parties beyond what is required by law or ordinary care." Petr.'s Mem. of Law on Limitation of Liability Issues ("City Mem.") 18. This argument is correct as far as it goes. Nevertheless, the law is clear that, where the City has a duty to exercise due care, the City's internal rules are relevant to determining what constitutes due care. Thus, in De Kwiatkowski v. Bear, Stearns & Co., 306 F.3d 1293 (2d Cir. 2002), the Second Circuit said that "noncompliance with internal standards could be evidence of a failure to exercise due care, assuming . . . a duty as to which due care must be exercised." Id. at 1311. Unlike De Kwiatkowski, upon which the City relies, where no duty was owed to the plaintiff, here the City owed a duty to its passengers to exercise reasonable care. Indeed, it was once the rule that a common carrier had a higher duty – a duty of extraordinary care. This rule was justified because the common carrier "has a comparative

8

advantage in accident prevention (indeed, passengers are normally helpless to avert an accident) and because a collision . . . (like a plane crash today) is likely to kill or seriously injure them." Richard A. Posner, A Theory of Negligence, 1 J. Legal Stud. 29, 38 (1972).  While the duty of extraordinary care has been rejected as a standard, its underlying premise is reflected in the traditional reasonableness standard, which "necessarily takes into account the circumstances with which the actor was actually confronted when the accident occurred, including the reasonably perceivable risk and gravity of harm to others and any special relationship of dependency between the victim and the actor."  Bethel v. N.Y. City Transit Auth., 92 N.Y.2d 348, 353 (1998).

Although the City's duty as shipowner was to exercise "reasonable care under the circumstances," Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 631 (1959), an objective standard, this duty is calibrated to the precise information available to the shipowner. "The theory is that a person who knows or should know of a danger is under a duty to be more careful than the one who, through no fault of his own, lacks such knowledge."  Winters, supra, at 909; see also Toth v. Cmty. Hosp. at Glen Cove, 22 N.Y.2d 255, 263 (1968) (Keating, J.) ("It is not unreasonable to impose upon a physician, who believes that added precautions are necessary, the obligation that he act diligently in taking the necessary safety measures.").  While the City argues that it could not foresee the cause of the assistant captain's disability, namely, "that Smith would withhold critical information about his physical condition and fall asleep at the wheel," City Mem. 28, its argument misses the point.  The issue is not whether the City could foresee each of the possible causes of the pilot's disability, it is whether the City could foresee the possibility that the pilot would become disabled.  The City's promulgation of the two-pilot rule is evidence that it perceived the risk to the passengers "[s]hould the Captain suffer any sudden

disability preventing him from exercising his duty . . . ." City of New York Department of Marine and Aviation, Rules and Regulations Ashore and Afloat at 6 (1958); see also Ryan Plea Allocution 47:2-48:4. Indeed, the City concedes that "[it] did perceive the risk." Petr.'s Reply Mem. of Law on Limitation of Liability Issues 13.

Moreover, as already suggested, this is not the only purpose for which the two-pilot rule is relevant. In Danbois, the New York Court of Appeals held that the violation of internal rules "is not negligence in itself but under certain circumstances may be regarded by the trier of the fact as some evidence of negligence." 12 N.Y.2d at 239. Consistent with this principle, the Court of Appeals approved an instruction informing the jury that:

> [The defendant] was to be judged by a standard of reasonable care, in conjunction with which they might consider [the internal] rule 103 as "a standard that the railroad sets itself for its employees" [to follow], but that violation of the rule . . . "is not in and of itself negligence" and that whether or not a violation would be negligence depended upon whether they found that it set a standard which reasonable prudence required. If the rule set a higher standard than that, the jury were told that the rule would not avail the plaintiff.

Id. at 237. Of course, as Danbois holds, the mere failure to comply with the two-pilot rule is not, on its own, a basis for finding the City negligent. Whether it provides a basis for such a finding depends "upon whether . . . [the rule] set a standard which reasonable prudence required." Id.

Judge Learned Hand spoke to this issue in United States v. Carroll Towing Co., 159 F.2d 169 (2d Cir. 1947), which focused on the obligation of the owner of a barge to have "a bargee or other attendant" in place in the event that the barge broke away from its moorings. Id. at 173. Judge Hand observed that:

> Since there are occasions when every vessel will break from her moorings, and since, if she does, she becomes a menace to those about her; the owner's duty, as in other similar situations, to provide against resulting injuries is a function of three variables: (1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions.

Id.  In order "to bring this notion into relief," he stated the formula "in algebraic terms" as follows: "[I]f the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B<PL."  Id.

The "Hand Formula," so denominated by Judge Posner, "has since been applied in a variety of cases not limited to admiralty."  McCarty v. Pheasant Run, Inc., 826 F.2d 1554, 1556 (7th Cir. 1987) (Posner, J.).  The City acknowledges its applicability here.  City Mem. 28.  As Judge Posner points out, "[a]lthough the Hand Formula is relatively recent, the method it capsulizes has been used to determine negligence ever since negligence was first adopted as the standard to govern accident cases."  Richard A. Posner, Economic Analysis of Law 169 (6th ed. 2003).  Moreover, as Judge Posner's scholarship reflects, "[r]ecent interest in the application of economic principles to legal analysis has brought renewed attention to Hand's formula."  Lewis F. Powell, Jr., Foreword to Gerald Gunther, Learned Hand: The Man and the Judge, at x (1994). Judge Posner provides an economic analysis of the Hand Formula:

> Hand was adumbrating, perhaps unwittingly, an economic meaning of negligence. Discounting (multiplying) the cost of an accident if it occurs by the probability of occurrence yields a measure of the economic benefit to be anticipated from incurring the costs necessary to prevent the accident.  The cost of prevention is what Hand meant by the burden of taking precautions against the accident.  It may be the cost of installing safety equipment or otherwise making the activity safer, or the benefit forgone by curtailing or eliminating the activity.  If the cost of safety measures or of curtailment – whichever cost is lower – exceeds the benefit in accident avoidance to be gained by incurring that cost, society would be better off in economic terms, to forgo accident prevention.  A rule making the enterprise liable for the accidents that occur in such cases cannot be justified on the ground that it will induce the enterprise to increase the safety of its operations. . . . If on the other hand, the benefits in accident avoidance exceed the costs of prevention, society is better off if those costs are incurred and the accident averted, and so in this case the enterprise is made liable, in the expectation that self-interest will lead it to adopt the precautions in order to avoid a greater cost in tort judgments.

Posner, A Theory of Negligence, supra, at 33. While Judge Posner's analysis of the economic meaning of negligence may not have been in Hand's mind, the Hand Formula reflects a rational method of determining the reasonableness of the conduct of a party who foresees a risk of injury to another to whom he owes a duty of care.

The application of this formula compels the conclusion that the City did not act reasonably to avoid the risk to the passengers who rode the Staten Island Ferry. The probability, however remote, of a scenario where the pilot would become incapacitated was considered by the City. The gravity of possible resulting injury to its passengers, not to speak of the City's exposure to substantial monetary damages, is reflected in the loss of life and devastating injuries suffered by the passengers on the *Barberi*. It is unnecessary to quantify these factors, because enforcing the two-pilot rule involved nothing in the way of an additional burden, and the City does not argue otherwise. On the contrary, there were two qualified pilots on the Staten Island Ferry and the City concedes that, in these circumstances, "there would be no additional expense involved" in requiring the presence of the second pilot in the pilothouse. City Mem. 29.

Compliance with the two-pilot rule would have also satisfied Rule 5 of the Inland Navigation Rules, which requires every vessel to maintain a proper lookout "at all times . . . so as to make a full appraisal of the situation and the risk of collision," 33 U.S.C. § 2005, thus relieving the City of the burden of also having to maintain a lookout in the pilothouse. Indeed, one of the principal responsibilities of the assistant captain, as set out in the SOP, is to "advise the Captain of any dangers, tide, current, aid to navigation changes or discrepancies occurring over the route." SOP at 1, attached to Rush Aff. as Ex. 6A. Moreover, the evidence is undisputed that when the two-pilot rule was not observed, another member of the crew served as a lookout. The only point during the trip when the lookout was excused was near the end of the

trip across New York Harbor when the ferry reached the KV Buoy, and then only if vessel traffic and other conditions did not dictate otherwise.  See Gansas Aff. ¶ 19.

The lookout rule was not the only safety rule in existence when the two-pilot rule was promulgated that required the City to assign additional personnel.  Specifically, federal regulations require that, "[i]n addition to the licensed deck officer or pilot, there shall be at least one member of the crew also on watch in or near the pilothouse at all times when the vessel is being navigated."  46 C.F.R. § 78.30-5.  The origin of this pilothouse watch rule can be traced to an earlier rule adopted by the Board of Supervising Inspectors – a body that Congress created in 1852 as it increasingly involved itself in the regulation of steamboats and ferries for the protection of passengers.  See United States v. Ryan, 365 F. Supp. 2d 338, 344-46 (E.D.N.Y. 2005) (discussing the history of federal regulation of steamboats, ferries, and other passenger vessels).  The purpose of this federal regulation is "to cover any emergency caused by the sudden disability of the pilot."  The Scandinavia, 11 F.2d 542, 545 (S.D.N.Y. 1918).  Indeed, an early case explicitly held that the presence of a quartermaster in the pilothouse, in addition to the pilot, complied with the rule, although that fact "did not excuse the absence of a lookout."  Id. The City makes a number of arguments with respect to whether Rule 5 or the pilothouse watch regulation were violated when Selch was released to go below to help with the docking. Nevertheless, it seems clear that, when a second qualified pilot was not present in the pilothouse, the City assigned one other person to the pilothouse for almost the entire voyage.  This fact confirms that the enforcement of the two-pilot rule would not have imposed a burden on the City; instead, it would have lessened a burden that the City already assumed.

Moreover, the City was not the only ferry operator that apprehended the risk of pilot incapacitation and took precautionary measures to prevent the type of accident and subsequent

13

deaths that occurred here.  Captain Kelly Mitchell, the Senior Port Captain for the Washington State Ferries, the largest ferry operator in the United States, submitted an affidavit testifying to the fact that:

> It is an operational and a safety requirement of the Washington State Ferry System to have at least two (2) qualified people: a licensed officer and the quartermaster, in the pilot house of each ferry <u>at all times</u>.  The Washington State Ferry Safety Management System (SMS) currently establishes this as the written procedure for the fleet.

Mitchell Aff. ¶ 18 (emphasis added).  Captain Mitchell described the duties of the licensed officer and the quartermaster as follows:

> The watch officer's duties are to navigate the boat safely, to act as a look-out and to give conning orders to the quartermaster.  The documented quartermaster's duties are to steer the boat, to control the engines as ordered by the watch officer, and also to act as lookout.  In the event that either the quartermaster or the Licensed deck officer of the watch becomes incapacitated, either of the watch team members are qualified and capable of steering and controlling the engines.  In conditions of low visibility or dense traffic we also assign at least one other seaman to stand watch in the pilothouse as lookout, and we supplement the Bridge Watch Team with an additional licensed deck officer [a pilot].  Under those circumstances we have four qualified watchstanders in the pilothouse, two of whom are Coast Guard licensed Merchant Marine Officers.

<u>Id.</u> ¶ 16.

This affidavit is consistent with the testimony of Captain Gary N. Haugland, who was employed by the Washington State Ferries from 1965 to 1995 and spent the last twenty-three years of his employment serving in the wheelhouse as a licensed deck officer and first class pilot.  <u>See</u> Haugland Aff. ¶ 2.  Captain Haugland testified that the Washington State Ferries carried two licensed qualified pilots, but it did not require that both be present in the pilothouse at all times.  Haugland Dep. 153:11-13, Apr. 28, 2006.  Nevertheless, he testified that, in the event the licensed deck officer (a pilot) became incapacitated the following procedures were in place:

> [T]he quartermasters . . . know the operation of the waters of the Washington State Ferries. They have been trained and are qualified, know the controls, the steering and the throttles of the Washington State Ferries, that they would be able to steer the vessel away from danger, make the appropriate turn, steady up if the turn had been initiated, that the boat is not going to continue around and run aground.
>
> The quartermaster knows the local knowledge and he would be able to steady [] the vessel up, call the chief mate to the bridge, stop the vessel, and if need be, just summon the captain, hey, where are we going, to get his attention back to the navigation, had he not had a heart attack or was unconscious.

Id. 197:2-17.

While this practice may not be enough to suggest industry custom, it demonstrates that the risks associated with having only one captain on duty were both foreseeable and actively addressed by another large-scale ferry system. As Judge Hand observed in a case in which various precautions were employed and none were so common as to be customary, "[c]ertainly in such a case we need not pause; when some have thought a device necessary, at least we may say that they were right, and the others too slack." The T.J. Hooper, 60 F.2d 737, 740 (2d Cir. 1932). In T.J. Hooper, "one line alone" equipped its tugs with the safety device that Judge Hand concluded "can now be got at small cost and is reasonably reliable if kept up; obviously it is a source of great protection to their tows." Id. at 739.

This case is more compelling than T.J. Hooper, because here the City of New York had come to a conclusion similar to that of the Washington State Ferries. While others may not have followed this procedure, in this case "at least we may say that [the City and the Washington State Ferries] were right, and the others too slack." Id. at 740. Moreover, the practice followed by the Washington State Ferries also provides an example of a possibly less burdensome precaution, namely, training the lookout to take emergency navigational measures in the event

the pilot was incapacitated. Indeed, there is evidence to suggest that other crew members voluntarily undertook such training in order to qualify for a pilot license. See Gansas Aff. ¶ 2.

The City argues that, even if "[t]he two-pilot rule generally required the Captain and Assistant Captain to [be] in the pilothouse at all times . . . the rule was subject to the ultimate discretion of the Captain." City Mem. 19 (emphasis in original). The City bases this argument on the Staten Island Ferry's alleged operative SOP, which states in the very last sentence that "[t]he Captain, may at any time, utilize the crew as seen fit," SOP at 8, and on Captain Gansas's affidavit. See Gansas Aff. ¶ 7 ("The determination of when both the Captain and the Assistant Captain were required to be in the pilothouse was left to the Captain's discretion."). However, the only written document in the record that contains the language on which the City relies is a document labeled "SOP which Mate Rush believes he had seen at some point." See Ex. 6A. While an agreement between the parties includes this document in the record, notwithstanding serious issues relating to whether it was properly authenticated, as the finder of fact, I find that the City has not proven that it was the operative SOP. See 1 Mueller & Kirkpatrick, supra, ch. 1, § 31, at 168 ("Preliminary questions affecting admissibility often remain in the case if the judge decides to admit evidence because they affect weight and credibility as well.").

Specifically, Rush stated in his affidavit that:

Prior to the accident on October 15, 2003, I believe that at some point I had seen the Standard Operating Procedures, which is attached as Exhibit A. I do not recall exactly when I saw the Standard Operating Procedures, but because numerous procedures and policies were circulated after September 11, 2001, to the best of my recollection the document was circulated at some time after September 11, 2001.

Rush Aff. ¶ 5. This language on its face undermines any confidence that the SOP to which it refers was the operative document. Indeed, the fact that this is the only way the City is able to

authenticate this document as the SOP speaks to the manner in which it operated the Staten Island Ferry. This aside, the fact that the SOP addresses the duty of the crew with respect to the loading and offloading of vehicles, see SOP at 2, suggests that it predated September 11, 2001, because vehicles were not permitted on the Staten Island Ferry after that day. See Rush Aff. ¶ 3. Under these circumstances, I find only that there was an operative SOP that contained the two-pilot rule. Moreover, the affidavit of Captain Gansas, with respect to his understanding of his discretion in deciding "when both the Captain and Assistant Captain were required to be in the pilothouse," Gansas Aff. ¶ 7, indicates that his understanding was based on word of mouth. See id. ¶ 6. This does not establish that the rule was not violated; rather, it is only evidence of the City's negligence in failing to properly disseminate the SOP and to train its pilots.

Nor can the language of the written SOP, upon which the City relies, be construed reasonably as making discretionary the specific language requiring the presence of two pilots in the pilothouse at all times. The language by its terms does not confer on the captain the discretion to excuse himself from the pilothouse or relieve himself of any of his assigned duties. Moreover, the purpose of the two-pilot rule was to address the issue of the incapacitation of one of the pilots – an event that could occur at any time. Conferring unguided discretion on the captain to override the rule would be totally inconsistent with its purpose. Indeed, for this reason, even if the City's operative SOP gave the captain unguided discretion to override the two-pilot rule, it was unreasonable for the City to do so in light of the risk it admittedly perceived. Just as the violation of the City's internal rule does not constitute negligence per se, an exception it creates does not necessarily render its conduct reasonable. The application of the Hand Formula compels the conclusion that, except in the case of an overriding emergency, reasonable care under the circumstance required the City to keep two captains in the pilothouse

while the *Barberi* was underway or have a second crew member in place of the second pilot who was capable of responding to the incapacity of the pilot by slowing or steering the vessel until the captain or assistant captain could be summoned.

This brings me to the City's final argument that its "policy did provide sufficient safeguards" against pilot incapacitation, because even when there was only one qualified pilot in the pilothouse, "there was [a] second person charged with responsibility to warn of any impending danger." City Mem. 30. According to the City, this second person was Mate Rush. The City suggests that "[Rush's] duties at the time . . . were to monitor the situation and warn those in the pilothouse of any impending danger." Id. Because there were two mates on the *Barberi*, only one of whom was in the pilothouse, the City's claim that there was "a second person charged with responsibility to warn [the pilot] of any impending danger," id., seems to suggest that it was Rush's circumstantial presence in the pilothouse that gave rise to this duty. This argument assumes that it was Rush's obligation to take over the duties of a lookout after the dedicated lookout, Selch, was excused from the pilothouse. This assumption is totally inconsistent with the City's argument that it was proper for the lookout to be excused and for his duties to be performed by the assistant captain without any assistance. Id. at 19. Moreover, it is unclear on what basis Rush should have assumed it was his responsibility to take over the lookout function when, consistent with what Rush understood was normal procedure, he heard the assistant captain excuse the dedicated lookout. See Rush Aff. ¶ 11.

The City's Memorandum of Law could also be read as arguing that, instead of being in the pilothouse, Mate Rush should have been doing his assigned duties and, if he had done so, he would have been seen the impending danger in enough time to communicate with Assistant Captain Smith by radio, which presumably would have brought Smith back to consciousness,

and would have averted the disaster. In his affidavit submitted by the City, Rush described his duties as follows: "My duties as Mate with the Staten Island Ferry consisted primarily of loading vehicles, prior to September 11, 2001, supervising the deckhands and overseeing the process of docking and undocking the boats." Rush Aff. ¶ 3. Significantly, Rush added that "mates do not stand a lookout watch." Id. Moreover, Rush's assigned duties did not include any specific responsibilities that would address the perceived risk of pilot incapacitation. Indeed, in arguing that a dedicated lookout could be dispensed with during the last half mile of the *Barberi*'s trip to Staten Island, the City states that "any discussion of the lookout rule in this case is largely academic because the lookout's function is to look and report. The lookout is not intended as a safeguard against incapacitation." City Mem. 16. If that is true with respect to the lookout, it is certainly also true with respect to the mates.

By contrast, the principal purpose of having a second pilot in the pilothouse was to address the foreseeable risk of pilot incapacitation. The disaster that occurred when the assistant captain became incapacitated was the foreseeable consequence of the City's failure to enforce the only policy it had in place to deal with this contingency. The fact that this particular accident could possibly have been avoided if Mate Rush had taken over a function akin to that of a lookout while he was in the pilothouse, or if he had been performing assigned duties that had nothing to do with the issue of pilot incapacitation, is not sufficient to relieve the City of the responsibility for the foreseeable consequence of its failure to operate the Staten Island Ferry with either two pilots or one pilot and another person trained to deal with the incapacity of the pilot.

On the contrary, the law is clear that an injured party may sue a tortfeasor "for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the

concurrent negligence of others contributed to the incident." Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260 (1979). "A tortfeasor is not relieved of liability for the entire harm he caused just because another's negligence was also a factor in effecting the injury." Id. at 260 n.8. This rule reflects "the belief that a tortfeasor should be responsible for all consequences stemming from his actions, regardless of the fortuitous circumstance that others may also have contributed to the injury." Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1125 (5th Cir. 1995); accord Project Hope v. M/V IBN SINA, 250 F.3d 67, 76 (2d Cir. 2001) (shipper and motor carrier were jointly and severally liable when shipper's employee negligently misinformed third party about the proper temperature setting of a container and the motor carrier failed to verify that the temperature was properly set); Oakley v. United States, 622 F.2d 447, 449 (9th Cir. 1980) (determining Navy was liable for entire damage to contractor's employee because of its negligence in failing to make poles strong enough to support the installation of fire alarm system despite the fact that the contractor was aware of the Navy's failure but negligently proceeded with the installation work); see also 1 Dan B. Dobbs, The Law of Torts § 171 (2001); 3 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, The Law of Torts § 10.1 (2d ed. 1986).

While the common law of admiralty described in the Edmonds case is applicable here, New York law is to the same effect. The New York Pattern Jury Instructions includes the following instruction where there is evidence that an injury was caused by concurrent acts of negligence:

> An act or omission is regarded as a cause of an injury if it was a substantial factor in bringing about the injury, that is, if it had such an effect in producing the injury that reasonable people would regard it as a cause of the injury. There may be more than one cause of an injury, but to be substantial, it cannot be slight or trivial. You may, however, decide that a cause is substantial even if you assign a relatively small percentage to it.

1A New York Pattern Jury Instructions 2:70 (3d ed. 2007). The instruction adopts the definition of "substantial" used in the Restatement (Second) of Torts. See Restatement (Second) of Torts § 431 cmt. a (1965) (defining substantial as "conduct (which) has such an effect in producing the harm as to lead reasonable men to regard it as a cause"). The City's failure to provide a second pilot or otherwise adopt a reasonable practice that addresses the issue of pilot incapacitation was plainly a substantial factor in causing the disaster. Because this negligence is directly attributable to its director of ferry operations, the City cannot limit its liability to the value of the *Barberi*.

The foregoing discussion has accepted a number of premises underlying the City's argument. The central premise of the argument, however, cannot survive careful scrutiny. Much of the City's argument is based on the language of the SOP that "Mate Rush believes he had seen at some point." Ex. 6A. The document does not provide a clear description of the duties of the mate on the *Barberi*. Instead of an easily understood manual, it reads more like a contract containing clauses that incorporate by reference other clauses in the document. Thus, the language on which the City relies, see City Mem. 30, is from the description of duties of the Mate onboard the *Kennedy* class vessels, which provides that "[a]s the boat is approaching the slip the Mate will be at the inshore end of the vehicle deck observing the slip, aprons and bridge ready to wave the Captain off if any dangerous or unsafe conditions exist." SOP at 2. The SOP also directs the Mate on the *Kennedy* class, while the ferry is underway, to patrol "all decks constantly on the lookout for any situation requiring attention." Id. The SOP then goes on to discuss the duties of the mate on the *Austen* class and says explicitly that the mate "follows the same operating procedures as the Mate onboard the Kennedy class with the exception of off and on loading vehicles and the rudder pin operation." Id.

After outlining the duties for a mate on the *Kennedy* and *Austen* class boats, the SOP then addresses the duties of the mate on the *Barberi* class – the class of boat at issue here. The description of the duties of the mates on the *Barberi* class states in full:

> While docking and undocking the two Mates onboard the Barberi Class will be stationed at the inshore end of the boat. The Number 1 Mate will be on the main deck and the number 2 Mate will be at the upper embarkation deck.
> Like the Austen Class there is no vehicle off loading and loading as well as no rudder pin operation. Each of the two mates will have the following areas of responsibility following the same operating procedures as the Mate onboard the Kennedy [C]lass.
> Number 1 Mate will be responsible for the main deck and the New Jersey side of the saloon deck including the stairs and ramps.
> The number 2 [M]ate will be responsible for the bridge deck and the Brooklyn side of the saloon deck including the stairs and ramps.

SOP at 3. Based on Rush's testimony, he was serving as the "number 1 Mate" on the trip at issue here. See Rush Aff. ¶ 8. On the assumption that this language could be read as imposing a duty on Mate Rush to warn of hazards in the water, the City offers no evidence that Rush read it this way or that he read it at all. Rush's affidavit that was submitted by the City states only that he believed he had "seen" the SOP – not that he had read it. See id. ¶ 5. Captain Haugland, the expert on whom the City relies for its argument, testified that he did not believe that Mate Rush even knew about the prescribed procedures, because the City did not enforce them. Haugland Dep. 48:14-17. Nor did the City offer any evidence that Rush had any understanding that he had the responsibility akin to that of a lookout "to monitor the [navigational] situation and warn those in the pilothouse of any impending danger." City Mem. 30. Again, in his affidavit submitted by the City, Rush explicitly stated that "mates do not stand a lookout watch," and he classified his duties as consisting "primarily of . . . supervising the deckhands and overseeing the process of docking and undocking the boats." Rush Aff. ¶ 3. Under these circumstances, there is every reason to conclude that it was Patrick Ryan's failure to properly ensure that the crew

was familiar with the SOP and complied with it that was the cause of any alleged failure on Rush's part to adhere to his prescribed duties.

Nevertheless, accepting the language of the SOP upon which the City relies and Rush's familiarity with it, the duty of the two mates on the *Barberi* was not to act as some sort of navigational lookout to assist in the safe navigation of the ferryboat across the New York Harbor. Instead, to the extent that it could be read as encompassing any lookout function, it involved "observing the slip, aprons and bridge" at the point in the voyage when the vessel was close to entering the ferry slip. Thus, Captain Haugland, testified that, in his experience, "a mate making a landing . . . is on the car deck during landing, he is not on the car deck one-half mile from the dock. So he wouldn't be in a position at that time [the time when the Assistant Captain lost conscious awareness here] to observe the vessel straying off course." Haugland Dep. 52:25-53:7. Instead, Haugland explained, "[t]he mate on the landing to wave off any impending dangers, in my opinion, in my experience with Washington State Ferries, would be the final less than 100 feet into the dock to notify the captain of any impending danger . . . that the captain may not see." Haugland Dep. 53:8-14. By that point, where the ferry was "less than 100 feet into the dock," any warning would have come too late. See Selch Aff. ¶ 8.

While Captain Haugland's testimony related to the practice of the mate on the Washington State Ferries, the City did not offer any evidence to suggest that practice on the Staten Island Ferry was any different. Indeed, there is no evidence that the second mate onboard the *Barberi* was not present on the inshore end of the boat. Thus, I find that Mate Rush's failure to be present on the inshore end of the main deck as the *Barberi* was about to enter the slip did not contribute to the collision.

The City argues alternatively that, "[e]ven in the absence of a specific duty as outlined in the SOP . . . Captain Haugland, testified that as part of the mate's obligation to exercise prudent seamanship, Mate Rush was obligated to keep his eyes and ears open and advise those in charge of the vessel of any impending dangers." City Mem. 30. Again, the suggestion that the mate (of which there were two on the *Barberi*) served the role of a lookout is belied by the practice on the Staten Island Ferry and by the evidence that, even when there was only one pilot in the pilothouse, there was always a dedicated lookout with him with the exception of the last half-mile of the trip – a practice that the City argues was entirely proper because a dedicated lookout was not required at that point. Id. at 8, 13 (citing its own expert's testimony). The City did not regard the mates as substitutes for the lookout, nor could they have undertaken this responsibility, because their duty during the voyage – according to the SOP Mate Rush believes he saw – was to patrol "all decks constantly on the lookout for any situation requiring attention." SOP at 2. The patrol included the enclosed passenger decks and the "stairs and ramps." Id. at 3. The performance of these duties could not fulfill the obligations of a lookout because it did not involve "giving undivided attention to possible obstructions or dangers." Circle Line Sightseeing Yachts, Inc. v. City of New York, 283 F.2d 811, 815 (2d Cir. 1960). On the contrary, except at the very end of the voyage, it involved at most incidental attention to what was going on outside the vessel. Moreover, I have already found that Rush's absence from the inshore deck at the very end of the voyage did not contribute to the collision and that, even if it did, the negligence attributed to the City was a substantial factor in causing the collision.

In conclusion, returning to the test formulated by Judge Hand, operating a large ferry carries with it a small risk of great harm. Certainly one such foreseeable risk is that the pilot would become incapacitated and the boat would crash, with the consequent loss of life and

physical injury.  Requiring that a second pilot be in the pilothouse is a simple, practical, and cost-effective way to counter this risk.  Under the circumstances here, enforcing the rule was cost free and the City's failure to do so constituted a breach of the duty of care owed to the *Barbieri*'s passengers, who entrusted their safety to the City.  This breach of duty was a substantial factor in causing the deaths and injuries suffered by the plaintiffs.  Because I decide the case on this basis, it is not necessary for me to address the other bases for liability on which the plaintiffs rely.

## Conclusion

I deny the City's petition seeking to avoid any legal liability for the damages that resulted from this disaster or to limit its liability to the value of the *Andrew J. Barberi*.  This Memorandum and Order constitutes my finding of fact and conclusion of law pursuant to Federal Rule of Civil Procedure 52.

**SO ORDERED:**

Brooklyn, New York
February 26, 2007

 s/ Edward R. Korman
Edward R. Korman
United States Chief District Judge