UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                        :

In the Matter of the Complaint of         :

                        :      **MEMORANDUM & ORDER**

THE CITY OF NEW YORK, as Owner    :

and Operator of the M/V ANDREW J. BARBERI  :       03-CV-6049 (ERK)

-------------------------------------------------------------X

KORMAN, Judge:

      On the afternoon of October 15, 2003, the Staten Island Ferry *Andrew J. Barberi* (the

"*Barberi*" or "Ferry") collided with a maintenance pier near the Staten Island Ferry Terminal, killing

eleven passengers and injuring more than seventy. The *Dorothy J*, a tugboat owned and operated

by Henry Marine Service, Inc. ("Henry Marine"), one of the two claimants in this action, came to

the aid of the *Barberi* shortly after the crash. The second claimant, Robert Seckers, a licensed

Master employed by Henry Marine, served as Mate aboard the *Dorothy J* and was second-in-

command of the tug at the time of the incident. In motions for summary judgment, both Henry

Marine and Seckers argue that the services provided to the *Barberi* constitute marine salvage thereby

entitling them to receive a salvage award from the City of New York, owner of the *Barberi*. I

conclude that the services provided by the *Dorothy J* and its crew in the immediate aftermath of the

collision warrants a salvage award. I do not agree that the services the *Dorothy J* provided in

keeping the *Barberi* stable in the ferry slip once the City had ordered it to do so – as it was entitled

to do under the terms of its contract with Henry Marine – justify a salvage award to either Henry

Marine or Robert Seckers.

**Background**

In 2001, the City of New York requested bids on a contract for tugboat services for Department of Transportation ("DOT") ferry vessels and other floating equipment. Henry Marine submitted the lowest bid and was awarded a twelve-month contract, beginning March 14, 2002, for an estimated 800 hours at $239.00 per hour of service. The contract was modified in December 2002, to increase the number of hours allowed, and renewed for another twelve-month period in March 2003. The City again modified the contract in 2003 to increase the hours of service and to increase the total estimated contract price. This contract was in force on October 15, 2003.

Under the terms of the contract, Henry Marine agreed to provide the DOT with tugboat services for towing, which included maneuvering, shifting, pumping and siphoning. The contract also included additional services, such as firefighting, aiding stranded ferry vessels as an emergency response vessel, and other authorized work as required by the DOT. Tugboat Service Agreement § 8, at C-3, attached to Henry Marine Mem. Supp. Summ. J. ("Henry Marine Mem.") as Ex. 9. The contract required Henry Marine to make its services available to the DOT twenty-four hours a day, seven days a week. *Id.* The contract also stated that Henry Marine "shall be held responsible for meeting the times and dates set forth by the Department [of Transportation] for such services." *Id.* The standard operating practice for the contract was that the DOT would initiate all requests for assistance and other work instructions, *see* Olsen Aff. ¶ 3, attached to Pet'r's Cross-Mot. for Summ. J. ("City Mot.") as Ex. 15, and Henry Marine was required to perform the work "in a thorough and workmanlike manner to the satisfaction of the Commissioner and in accordance with his/her directions." Tugboat Service Agreement § 3, at C-2.

On the afternoon of October 15, 2003, the Staten Island Ferry *Andrew J. Barberi* had been making its regularly scheduled trip from Whitehall Terminal, Manhattan, to St. George, Staten

Island, when it suddenly crashed into a concrete maintenance pier (pier B-1) near the Staten Island Ferry Terminal. The weather, though very windy, was clear and not extreme. Despite the fact that the *Barberi* had been off course before the accident occurred and was proceeding at full speed toward the Staten Island Ferry Terminal, the only evidence in the record that any crew member noticed that something was amiss is the affidavit of the deckhand, Joseph Selch, which stated:

> I was untying a door in preparation for docking, I looked up and saw that the ferry was proceeding past the slips and on what appeared to be a collision course with a nearby pier. I took immediate action to guide passengers away from the Staten Island end of the ferry. Moments later the ferry hit the pier.

In fact, it does not appear that the *Barberi* sounded any warnings, alarms, or alerts before it struck the pier. Of course, we now know that the collision occurred "after Assistant Captain Richard Smith, who had been piloting the vessel, suddenly became incapacitated." *United States v. Ryan*, 365 F. Supp. 2d 338, 338-39 (E.D.N.Y. 2005). Unfortunately, however, none of the crew members were "aware of Smith's incapacitation and able to respond in order to prevent the crash." *Id.* at 339. *See also In re City of New York*, 475 F. Supp. 2d 235, 236-37 (E.D.N.Y. 2007).

When the *Barberi* struck the pier, it was traveling at full speed of 14 to 16 knots, or 16 to 18 miles per hour. The speed, however, does not fully convey the force of the impact. The *Barberi* weighs more than 3,000 tons, and its momentum was enough to severely damage the maintenance pier and tear a long gash in the main deck of the *Barberi*. The collision had an even more devastating effect on the passengers; eleven passengers died and dozens of others were left with injuries that varied from minor to severe.

At the time of the collision, the *Dorothy J* was docked at a pier near the St. George Ferry Terminal on a job for the City, waiting for orders to tow an oil barge in New York Harbor. On board the tug that day were Captain Mark Creamer, Mate Robert Seckers, Engineer Mike Druda, and a

deck hand. The DOT had advised the crew that there would be a delay in the job, so Seckers was biding his time, sitting in the wheelhouse reading newspapers. Shortly before 3:30 pm, Seckers happened to look up from his newspaper and saw the *Barberi*, far off course and rapidly approaching the slip at which the *Dorothy J* was berthed. *See* Nat'l Transp. Safety Bd. Interview of Robert Seckers, Nov. 3, 2003, ("Seckers Interview") at 5, attached to City Mot. as Ex. 14. He quickly sounded the alarm whistle to alert the crew, but by the time Druda started the *Dorothy J*'s engines and the tug cast off from the dock, the *Barberi* had already collided with the pier. *See* Druda Aff. ¶ 4, attached to Seckers Mem. as Ex. G. Seckers immediately tried to contact the *Barberi* and the ferry office via radio, but no one responded to his calls. Seckers Aff. ¶ 12.

Seckers, Druda, and Creamer all stated that the *Barberi* was drifting along with the current and wind, in the direction of the Verrazano Bridge, and that they believed the *Barberi* had lost power as a result of the collision. Seckers Interview at 6-7; Creamer Aff. ¶ 6; Druda Aff. ¶¶ 6, 8. William Montgomery, a passenger on the *Barberi*, also stated that the *Barberi* had lost power, Montgomery Aff. ¶ 5, attached to Henry Marine Mem. as Ex. 8, and another passenger, New York City Police Officer John Downey, said that the *Barberi*'s engines stopped and the boat was drifting. Downey Aff. ¶ 3, attached to Henry Marine Mem. as Ex. 7. Seckers also claims that when he was finally able to contact the ferry office, he was told the *Barberi* had lost power, but not steering. Seckers Aff. ¶ 13. However, the Chief Marine Engineer for the Staten Island Ferry, Charles Covella, who was in the *Barberi*'s engine room at the time of the crash, has stated in opposition that the *Barberi* never lost propulsion or power before, during, or after the accident. Covella Aff. ¶¶ 11-14, attached to City Mot. as Ex. 11.

Regardless of whether the *Barberi* lost power or not, the crew of the *Dorothy J* recognized the potential danger and quickly proceeded to try to help the *Barberi* and its passengers. Seckers Aff. ¶ 13. Seckers first maneuvered the *Dorothy J* toward the damaged end of the *Barberi* so that the crew could tie some lines on her and stop the *Barberi* from drifting. Seckers Interview at 7; Druda Aff. ¶ 8. However, the crew of the *Dorothy J* struggled to secure a line on the damaged end of the *Barberi* and Druda ultimately had to go on board the *Barberi* in order to fasten the line. Seckers Interview at 7; Druda Aff. ¶ 9. The tug's crew attempted to attach push wires to the *Barberi* in order to push it back to the Ferry slip, Seckers Aff. ¶¶ 15-16; Druda Aff. ¶¶ 8-10; Creamer Aff. ¶ 7, but the damage and debris on the forward part of the *Barberi* prevented them from fastening any of the wires. Seckers Interview at 10; Creamer Aff. ¶ 7; Druda Aff. ¶ 8. The crew of the *Dorothy J* then took the line off the damaged end of the *Barberi*, maneuvered around to the stern of the boat, and attached their push lines on that end. *Id.* Captain Creamer also gave the *Barberi* the tug's first aid kit, Seckers Interview at 10, and the tug's crew attempted to calm the *Barberi* passengers and stop them from jumping onto the tugboat or into the water. Creamer Aff. ¶¶ 9-10; Druda Aff. ¶ 11; Seckers Aff. ¶¶ 18-19. Seckers had problems communicating directly with the crew of the *Barberi*, and he relayed this information to the ferry office, which advised the *Barberi* to keep in constant contact with the *Dorothy J*. Seckers Interview at 11:20-25; Olsen Aff. ¶ 6.

Once the wires were fastened to the *Barberi*, the *Dorothy J* began to push the *Barberi* back to the passenger slip, where emergency personnel were waiting to help. *See* Creamer Aff. ¶ 10; Druda Aff. ¶ 11; Montgomery Aff. ¶¶ 7, 10. With the help of the *Dorothy J*, the *Barberi* was able to get back to the ferry landing within a half hour after the accident. *Id.* The *Dorothy J* was then ordered by the City to spend the next several days continuously pushing on the *Barberi* in order to

hold her in position, thus making it easier for investigators and other personnel to access the boat. *See* Julian Aff. ¶¶ 15-16; Creamer Aff. ¶ 12; 2003 Standard Diary from the *Dorothy J*, City Mot. Ex. 8; Daily Work Reports for the *Dorothy J*, City Mot. Ex. 9. During that period, the City refused to allow the *Dorothy J* "to attach any lines or cables to the ferry due to the ferry's instability and concern that the ferry may sink at its berth, taking the tug and its personnel down with it." Julian Aff. ¶ 19.

On Saturday morning, October 18, 2003, "a separate tug boat company was hired and dispatched to transport the ferry from the Staten Island ferry terminal to the Brooklyn Navy Yard." *Id.* ¶ 22. The *Dorothy J* was then released from its assignment and proceeded to the maintenance pier to await its next job. *See* 2003 Standard Diary; Daily Work Report. Of the sixty-five hours and thirty-five minutes that the *Dorothy J* assisted the *Barberi*, the City alleges that sixty-five occurred after the *Dorothy J* was ordered to hold the *Barberi* in position.

On March 10, 2004, Henry Marine filed a salvage claim against the City of New York requesting $6,000,000 for the "high level of performance and skill rendered from Wednesday, October 15, 2003 through Saturday, October 18, 2003," and for the "rescue of this valuable ferry and those aboard from her perilous position." Seckers also submitted a salvage claim (along with a maritime tort claim that is not at issue here) against the City for $2,000,000 for his "extraordinary and necessary salvage services." Both Seckers and Henry Marine have filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the issue of whether the services rendered to the *Barberi* by the *Dorothy J* constitute a cognizable marine salvage claim. The City of New York has filed a cross-motion for summary judgment.

**<u>Discussion</u>**

Salvage is a doctrine unique to maritime law that pre-dates the Christian era by nine hundred years. *See* Martin J. Norris, 3A *Benedict on Admiralty* §§ 1, 5-14 (7th ed. 2006). It refers to the principle of rewarding services that are "voluntarily rendered to a vessel needing assistance, and [are] designed to relieve her from some distress or danger either present or to be reasonably apprehended." *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir. 1983) (quoting *McConnochie v. Kerr*, 9 F. 50, 53 (S.D.N.Y. 1881)). This right to be rewarded for saving a ship or its property from peril first appeared in the Rhodian maritime code and was later incorporated into Roman law and then English maritime law. *See* 3A *Benedict on Admiralty* §§ 5-8. It is an equitable right intended to reward people for "spontaneous services, rendered in the protection of the lives and property of others." *Id.* § 6 (internal citations omitted). "Compensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of *quantum meruit*, or as a remuneration *pro opere et labore*, but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." *The Blackwall*, 77 U.S. (10 Wall.) 1, 13 (1860); *see also The Clarita and the Clara*, 90 U.S. (23 Wall) 1, 17(1874) (explaining that the "liberal rules as to remuneration were adopted and are administered not only as an inducement to the daring to embark in such enterprises, but to withdraw from the salvors as far as possible every motive to depredate upon the property of the unfortunate owner").

To determine whether Henry Marine's and Seckers's actions constituted a salvage service, and not simply routine towing or pushing services, it is necessary to determine whether (1) there was marine peril; (2) the service was voluntarily rendered and not required by duty or contract; and (3) the operation was a success or the services provided contributed to the success. *See The "Sabine"*,

101 U.S. 384, 384 (1879); *B.V. Bureau Wijsmuller*, 702 F.2d at 338. Because the *Dorothy J* successfully helped push the *Barberi* back to the passenger slip, the third requirement is not in dispute. Nevertheless, the City contests that the *Barberi* was in marine peril following the crash and that the *Dorothy J* and her crew acted voluntarily when it came to the aid of the *Barberi*. I first address whether the *Barberi* was in marine peril as contemplated under the principle of marine salvage.

"Marine peril exists when the vessel is in a situation that might expose it to loss or destruction at the time the services are rendered." *New Bedford Marine Rescue, Inc. v. Cape Jeweler's Inc.*, 240 F. Supp. 2d 101, 112 (D. Mass. 2003) (internal citation omitted). In order to constitute marine peril, the danger to the vessel and property "must be present and impending," but it need not be "immediate or absolute." *B.V. Bureau Wijsmuller*, 702 F.2d at 338. Indeed, the *degree* of peril does not determine whether the act constitutes salvage; rather, it only affects the degree of the *service*, and hence, the amount of the reward. *McConnochie v. Kerr*, 9 F. 50, 53 (S.D.N.Y. 1881) (requiring only that a ship be confronted by "a situation of actual apprehension, though not of actual danger"), *modified sub nom.*, *McConnochin v. Kerr*, 15 F. 545 (S.D.N.Y. 1883); *see also The Alaska and her Cargo*, 23 F. 597, 607 (S.D.N.Y. 1885) (The degree of peril only "affect[s] the degree of the service, not its nature."); *accord The Urko Mendi*, 216 F. 427, 429 (D.C. Pa. 1914) (Peril exists even "if a vessel is in a situation of actual apprehension though not of actual danger."). "'Reasonable apprehension of injury or destruction if the services are not rendered' is the standard by which peril is adjudged to be present." *B.V. Bureau Wijsmuller*, 702 F.2d at 338 (quoting *Phelan v. Minges*, 170 F. Supp. 826, 828 (D. Mass. 1959)).

If there is not any danger, the services cannot be called marine salvage. *B.V. Bureau Wijsmuller*, 702 F.2d at 338. The City argues that, regardless of the significant damage to the *Barberi*'s main deck, the *Barberi* was not in any danger. In support of this contention, the City cites the fact that the *Barberi* never lost power, propulsion, or steering and, as a subsequent investigation revealed, did not suffer a hull breach or any other material damage to the hull structure that could have resulted in the *Barberi* sinking or capsizing. This argument is without merit. "In order to make a salvage service it is not necessary that a vessel, whether sailing or steam, should be unnavigable, or that a steam vessel should be injured not merely in her machinery but in her hull or her sails also." *The Saragossa,* 21 F. Cas. 425, 426 (S.D.N.Y. 1867). Instead, all that is required to establish marine peril is that there is a "[r]easonable apprehension of injury or destruction," *B.V. Bureau Wijsmuller*, 702 F.2d at 338 (internal quotation marks and citation omitted), and this determination must be made in light of the circumstances as they appeared at the time of the event and not from hindsight. *See The Lowther Castle*, 195 F. 604, 605 (D.N.J. 1912); *see also The Young America*, 20 F. 926, 927 (D.N.J. 1884).

In this case, the crew of the *Dorothy J* witnessed the *Barberi*, traveling at full speed, estimated at 14 to 16 knots per hour, crash into the concrete maintenance pier. The *Barberi* struck with such force that it destroyed roughly 1,500 square feet of the maintenance pier and tore a 210-foot-long gash in the main deck of the *Barberi*. Many of the passengers and crew have described the horrifying and chaotic scene aboard the *Barberi* after the crash. Admittedly, from their position aboard the *Dorothy J*, Seckers and the crew could not know what condition the *Barberi* was in or the precise extent of the damage suffered by the Ferry as a result of the accident. Nevertheless, they certainly could recognize the seriousness of the situation. Indeed, passengers aboard the *Barberi*

believed the boat was in danger of sinking, Downey Aff. ¶ 3; Montgomery Aff. ¶ 4, and Seckers was unable to contact the *Barberi* via radio immediately after the accident. Seckers Interview at 9, 17. When Seckers did hear from the *Barberi*, he was told the *Barberi* had lost power. Seckers Interview at 9, 20-21. There is also evidence that the City was concerned that the *Barberi* was in danger of sinking even after the *Dorothy J* pushed it back into the ferry slip, and, for this reason, directed the *Dorothy J.* to continue pushing on the *Barberi* instead of attaching lines or cables to the her. *See* Julian Aff. ¶ 19. Under these circumstances, there was a "[r]easonable apprehension of injury or destruction if the services [of the *Dorothy J* and its crew were] not rendered." *B.V. Bureau Wijsmuller*, 702 F.2d at 338.

The City also disputes that the service was performed voluntarily, arguing that the contract between it and Henry Marine created a pre-existing duty to act, and, thus, the *Dorothy J*'s actions merely constitute performance of a required contractual service. As the Supreme Court explained in *The Clarita*, "[a] salvor is defined to be a person who, without any particular relation to the ship in distress, proffers useful service and gives it as a volunteer adventurer without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel." 90 U.S. at 16. When considering whether the salvage service was voluntarily rendered, the salvor's motives are irrelevant, *B.V. Bureau Wijsmuller*, 702 F.2d at 339, rather, the important factor is that the service "was not rendered in pursuance of any duty owed to the owner or to the property." *The Clarita*, 90 U.S. at 17. Moreover, the party asserting a pre-existing duty defense (in this case the City) has the burden of proving the existence of such a contract. *Kimes v. United States*, 207 F.2d 60, 64 (2d Cir. 1953).

Henry Marine argues that its contract with the City was for towing services and did not contemplate the salvage services that were performed by the *Dorothy J*. Although towage and salvage may contain common elements, they are distinctly different types of services. "A towage service is one which is rendered for the mere purpose of expediting [the] voyage, without reference to any circumstances of danger." *McConnochie*, 9 F. at 53; *see also The Mercer*, 297 F. 981, 984 (2d Cir. 1924) (Towage "is ordinarily distinguished by the fact that it is aid rendered in the movement of vessels not in distress."); *The Flottbek*, 118 F. 954, 960 (9th Cir. 1902) ("When a tug is called or taken by a sound vessel as a mere means of saving time, or from considerations of convenience, the service is classed as towage."). Salvage, on the other hand, is a service "which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended." *B.V. Bureau Wijsmuller*, 702 F.2d at 338 (quoting *McConnochie*, 9 F. at 53). Here, the services performed by the *Dorothy J* were not "rendered for the mere purpose of expediting [the] voyage," but were rendered "to a vessel needing assistance" and were "designed to relieve her from some distress." *McConnochie*, 9 F. at 53.

Nonetheless, if the *Dorothy J* were acting pursuant to its contract with the City either when it first responded to the accident or thereafter, and it performed services of the nature contemplated by the contract, then Henry Marine would only be entitled to receive payment according to the terms of the contract. *See The Kennebec*, 231 F. 423, 426 (5th Cir. 1916) (finding a contract for salvage services to be binding even though the procuring party "stated to the other party that it was a towage service" because both parties to the contract understood the nature of the service to be rendered). In other words, Henry Marine will be precluded from bringing a salvage claim if the contract contemplated the scope and nature of work involved in performing a salvage service, or if the

services performed by the *Dorothy J* were neither inconsistent with, nor exceeded, that required by the contract. As the Court of Appeals for the Fifth Circuit held in an analogous case, that "the operations performed by ChemLink within the scope of its normal operations may have also had a salving effect does not mean that they exceeded the scope of ChemLink's contractual responsibility." *Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190, 1201 (5th Cir. 1989).

Henry Marine argues that the contract does not mention salvage and "by its plain language covers only the services specifically described therein as towage, shifting, pumping and [un]stranding." Henry Marine Mem. at 16. This is not an accurate or complete description of the agreement. While Henry Marine observes correctly that, under the terms of its contract, it was obligated to "provide the services of fully equipped tugboats . . . to properly tow and maneuver any and all authorized New York City floating equipment," *id.* § 8, at C-3, the contract also included services such as "shifting, pumping and/or siphoning, firefighting, aid stranded ferry vessels as emergency response vessel, and other authorized work as required." *Id.* This clause clearly encompasses services that have a salving effect. Indeed, providing firefighting assistance and aiding stranded vessels plainly come within the maritime definition of salvage. *See*, *e.g.*, *The Blackwall*, 77 U.S. at 8 ("Persons assisting to extinguish a fire on board a ship, or assisting to tow a ship from a dock where she is in imminent danger of catching fire, are as much entitled to salvage compensation as persons who render assistance to prevent a ship from being wrecked . . . ."); *Navigazione Generale Italiana v. Spencer Kellogg & Sons*, 92 F.2d 41, 44 (2d Cir. 1937) (A. Hand, *J.*) ("[W]hen a vessel is stranded she and her cargo are practically always in a substantial peril. Such a vessel is helpless because she cannot pursue her intended voyage or deal effectively with any emergency which may arise.").

Henry Marine next argues that the services rendered by the *Dorothy J* do not come within the definition of "stranded." This argument is well-taken. Stranding has a well-settled definition in a maritime context. As one commentary observes:

> Stranding occurs when the ship takes ground or strikes some obstruction to navigation such as a rock or reef or submerged piles, and is arrested and remains fixed for some space of time, or settles, being forced thereto by some external cause . . . . Stranding does not include . . . a mere temporary stoppage as where the ship merely strikes or runs against or into some obstruction, but is not fixed or settled, but passes on, since this is not a stranding.

9A Lee R. Russ & Thomas F. Segalla, *Couch on Ins.* § 137:88 (3d ed. 1995). Another commentary observes that a ship usually finds herself in need of salvage assistance after "grounding in shoal waters, sand, bar, reefs or rocks and, in general, going wherever a vessel shouldn't." Martin J. Norris, *The Law of Salvage* § 19 (1958). The manner in which the same commentary describes the process by which the salvage operation is performed also confirms the traditional definition.

> The salvage operation can be performed by attaching a towing line to the stranded vessel and pulling until she comes off. Sometimes the operation is aided by the stranded vessel's using her own machinery while the salving vessel is pulling. Another method is the placing of anchors a distance away from the distressed vessel and connected to the ship's winches. Pulling on the anchors by the use of her own machinery will often free the vessel. Still another method is that of removing cargo until the vessel floats free on a favorable tide, or is sufficiently lightened so as to be more easily pulled off.

*Id. See also Navigazione Generale Italiana*, 92 F.2d at 42.

Indeed, the City conceded in its first Memorandum that a stranding did not occur. *See* City Mem. at 10 ("The City's position is not that this casualty involved a "stranding," but that the Contract encompassed salvage-type services . . . ."). Moreover, at oral argument, held before me on March 28, 2007, the City's attorney, Wayne Meehan, who specializes in maritime law, agreed with the claimants that what occurred was "not a stranding per se within the meaning of [aiding

stranded ferry vessels].”  Hr'g Tr. 6:15-17, March 28, 2007.  I later asked Mr. Meehan: “Do you agree that aiding stranded ferry vessels as an emergency response vessel – that clause does not cover what [Henry Marine] did here?”  Mr. Meehan responded, “I concede that this was not a stranded ferry vessel; yes.”  Hr'g Tr. 7:14-20.

Nevertheless, in response to a suggestion that I made at oral argument, the City submitted a post-hearing memorandum arguing that the definition of stranded is “not as limited as Henry Marine suggests,” but in a general sense includes situations where someone finds himself in a difficult or helpless position.  Pet'r's Post-Hr'g Mem. of Law (“City Post-Hr'g Mem.”) at 5-6.  Citing this definition of “stranded”, the City argues that “it can be fairly stated that the [*Barberi*] was stranded and as such Henry Marine's actions were the aiding of a stranded ferry vessel, as specified in the Contract.”  City Post-Hr'g Mem. at 5.

Upon reflection, I disagree.  The contract here is one that relates specifically to maritime services.  Indeed, underscoring the understanding of the parties with respect to the specific nature of the contract, Section 6 provides that “[w]herever any feature of the work is not fully set forth in these specifications, it must be understood that the same shall be governed by the rules of the best modern practice, as followed by the maritime industry.”  The City does not offer any evidence that the parties intended the word “stranded” to encompass a broader definition wholly at odds with the understanding of that term in maritime context.  In the absence of such evidence, it is appropriate to apply the maritime definition of “stranded” to the term as it appears in the contract.  *See*, *e.g.*, *Robinson v. United States*, 80 U.S. (13 Wall.) 363, 366 (1871) (“Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary.”); 11 *Williston on Contracts* § 30:13 (4th ed. 1999)

("Words or phrases used in a business, trade or profession may, when placed in their context of facts and attendant circumstances, have a particular meaning irrespective of the ordinary sense in which they are used. 'Indeed when tradesmen say or write anything, they are perhaps without present thought on the subject, writing on top of a mass of habits or usages which they take as a matter of course.'" (citing *Nicoll v. Pittsvein Coal Co.*, 269 F. 968, 971 (2d Cir. 1920))).

Nevertheless, even if the phrase "aid stranded ferry vessels" did not cover the services rendered here by the *Dorothy J*, this is not the only service Henry Marine agreed to provide to the City. In addition to the services described with particularity in the contract, such as "shifting, pumping and/or siphoning, firefighting, aid stranded ferry vessels as emergency response vessel," in words that follow immediately, Henry Marine agreed to provide "*other authorized work as required*," Tugboat Service Agreement § 8, at C-3 (emphasis added). The context of this clause indicates that the parties intended the contract to apply to services similar to those specifically set forth in the preceding clause of the sentence.

> The ancient maxim *noscitur a sociis* summarizes the rule of both language and law that the meanings of particular words [or phrases] may be indicated or controlled by associated words. Applying the doctrine to a statute, the Supreme Court stated that "[t]he maxim *noscitur a sociis*, that a word [or phrase] is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings."

11 *Williston on Contracts* § 32:6 (4th ed. 1999) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). The services, for which salvage is sought here, fit easily within those services contemplated by the clause of the contract obligating Henry Marine to provide "other authorized work." Indeed, in this respect, the language of the contract is consistent with the affidavit of Paul Stanton, the assistant commissioner who signed the contract on behalf of the City, averring that "[t]he contract contemplated in the case of an apparent emergency, for example, loss of power, fire,

*et cetera*, Henry Marine was required to render tugboat assistance on an urgent basis is at the contract rate of 239 per hour." Stanton Aff. ¶ 19 (quoted at Mar. 28, 2007 Hr'g at 44:4-9).

Nor is this conclusion undermined by past business practices. Specifically, the affidavit of Dorothy Julian, the owner of Henry Marine, avers that the City has only used the services of Henry Marine for routine towing and shifting jobs. The past business dealings of the parties is a factor to consider when determining the parties' understanding of a contract, *see Flagship Marine Servs., Inc. v. Belcher Towing Co.*, 966 F.2d 602, 605-06 (11th Cir. 1992) (citing the parties' prior business relationship and "pre-existing business dealings" as a factor in its determination that the claimant was only entitled to receive a contract salvage award rather than an award for purely voluntary salvage). Nonetheless, it is not dispositive here. The fact that the City had not used Henry Marine to perform services of this nature may simply reflect the fortuity that there had not been an occasion for the City to call on Henry Marine to perform all of the services specified in the contract. Indeed, Henry Marine fails to offer any evidence that there were prior occasions for the City to call upon it for services of the kind at issue here. More significantly, the Emergency Response Training Manual, upon which Henry Marine relies, clearly anticipates that the tug company providing services to the City could be called upon to render assistance "in the event of a collision" if the Port Captain determines that the situation warrants such assistance and calls upon the tug company to provide it. *See Andrew J. Barberi* Class Emergency Response Training Manual at NYC 000085, attached to Henry Marine Mem. as Ex. 11 ("*Barberi* Class Emergency Response Training Manual").

Even if the contract contemplated the type of services performed by Henry Marine on the day of the crash, it argues that the manner in which the services were performed – i.e., the *Dorothy J*'s voluntary abandonment of its scheduled assignment and immediate response to the collision –

was not contemplated by the parties, and in fact, goes against the plain language of the agreement. They claim that the terms of the contract make it clear that all work was to be performed at the direction of the City, in accordance with its instructions, and that the City dictated when and where performance was required. The claimants contend that because "there was never a request to Henry Marine nor dispatch by the City on the date of the casualty as the contract envisions," they were not performing work under the contract. Henry Marine Mem. at 16. They argue that accepting the City's contention that the *Dorothy J* could perform the contract without having been dispatched or ordered would render the plain language meaningless.

I agree with the claimants' construction of the contract. First, section 3 of the General Conditions of the contract expressly requires that all work performed under the contract be done "in accordance with [the Commissioner's] directions." *Id.* § 3, at C-2. Moreover, the contract explicitly states that the City will set the time and dates for the work, *see id.* § 8.1, at C-3, and includes both the phrase "[w]hen *work is ordered* and the Contractor is sent out," *id.* § 8.5, at C-3 (emphasis added), and the phrase "payment will be for the actual number of hours spent performing the *work ordered.*" *Id.* (emphasis added). In addition to this language, Section 8.7, the liquidated damages provision contained in the General Conditions of the Tugboat Agreement, clearly states that: "All towing, shifting or other services *ordered* by the City under this Contract shall be furnished promptly *upon request* and shall be promptly completed. When *work is ordered*, the Contractor shall provide the tug or tugs within four (4) hours *after the order is given.*" *Id.* at C-4. (emphasis added). These operating procedures were confirmed by Todd Olsen, the deputy director of Dock Building, who was involved in the day-to-day management of the City's contract with Henry Marine. *See* Olsen Aff. ¶¶ 2-3. These procedures permitted the City to control both the nature and

time of the work and allowed the City to allocate work among the various contractors. Perhaps more significantly, the *Barberi*'s Emergency Response Manual expressly provides that, in the event of a collision, the Port Captain will be the person who will contact the tug companies if he/she determines the situation warrants such a call. *See Barberi* Class Emergency Response Training Manual.

Despite the City's argument to the contrary, there is insufficient evidence to create a triable issue of fact with respect to whether the *Dorothy J* was acting under any instructions from the City or ferry office when it first responded to the *Barberi*. In fact, the record demonstrates that Seckers and the crew of the *Dorothy J* had begun to act prior to having any contact with City personnel. Indeed, Seckers stated that no one responded when he tried to contact the *Barberi* and the Staten Island ferry office after the crash. *See* Seckers Aff. ¶ 12. Moreover, when Seckers did communicate with the ferry office, he did so on his own initiative to report that he was having trouble contacting the *Barberi*. *See* Seckers Interview at 11; Olsen Aff. ¶ 6. Under these circumstances, Henry Marine and Seckers are entitled to a salvage award for the prompt and spontaneous efforts to aid the *Barberi* in the immediate aftermath of the collision.

On the other hand, when the *Dorothy J* subsequently was ordered to hold the *Barberi* in place at the ferry slip, it was performing work of a kind that it was obligated to do under its contract with the City. Indeed, the *Dorothy J* already was performing work for the City in the immediate vicinity of the collision, and all that the order entailed was a change in the *Dorothy J*'s assignment. Moreover, even when it was holding the *Barberi* in place, it was performing the work in the manner directed by the City. *See* Julian Aff. ¶ 19 (quoted *supra* at 6). In sum, while Henry Marine is entitled to a salvage award for services it voluntarily performed in the immediate aftermath of the

collision, it is not entitled to a salvage award for the subsequent service it performed, pursuant to the order to continue pushing on the *Barberi* in order to hold it in its position in the ferry slip.

I turn now to the claim of Robert Seckers, who argues that, as a crew member aboard the *Dorothy J* on the afternoon of October 15, 2003, he is entitled to a salvage award for services. Of course, he is entitled to share in the salvage award to Henry Marine for the initial response of the *Dorothy J*. Nonetheless, he also argues that he is entitled to a salvage award for the subsequent service provided by the *Dorothy J*, even if those services were rendered under the contract. He claims that this right "is independent of and is not affected by the existence of any salvage contract" between Henry Marine and the City. Seckers Mem. at 5. Traditionally, maritime law discouraged the upholding of contracts for salvage, entered into during or in the immediate aftermath of the salvage that would, in effect, deny a crew its right to salvage awards. *See Squires v. The Ionian Leader*, 100 F. Supp. 829, 835 (D.C. N.J. 1951) (contract for salvage, made while the salvor was at sea and en route to the vessel in peril, did not bind the crew without their assent); *The Lowther Castle*, 195 F. at 608 (Despite a settlement after salvage services had been rendered, "the crew could not be deprived of the bonus which the law gives for such services simply because the owner of the tug made a settlement with the claimant for the services so rendered."). Similarly, under 46 U.S.C.A. § 10317 (1983), "a stipulation by which a seaman consents . . . to abandon a right [he] may have or obtain in the nature of salvage[ ] is void." Originally enacted in 1872 as Revised Statute U.S. § 4535, *see* United States Statutes at Large 17 Stat. 268 (1783-1873) § 31, and recodified in 1968 as 46 U.S.C. § 600, *see* Pub. L. 90-293, Apr. 25, 1968, 82 Stat. 107, § 1(c), this statutory provision was "intended to protect seamen, who seem to have been traditionally recognized as the wards of admiralty, against contracts which required a waiver of their rights as a condition

of employment." *Squires*, 100 F. Supp. at 835. Thus, although there were exceptions to the rule, *see, e.g., The Resolute*, 168 U.S. 437, 441 (1897), the owner of the salvor vessel could not, as a condition of employment, force the crew to waive its right to a share of a salvage award, to which the salvor would otherwise be entitled should it render assistance to a vessel in peril.

This is not the case here. The crew of the *Dorothy J* was not required to stipulate to waive a claim to share in any award of salvage to which its employer was entitled. Indeed, as I have construed Henry Marine's contract with the City, it is not entitled to a salvage award for the services it was ordered to perform pursuant to the contract entered into with the City – a contract that contemplated certain services, such as firefighting and aiding stranded vessels and the like, which fall under the category of salvage services. For those services, Henry Marine was to receive a sum certain, which was not contingent on the success of its efforts. Similarly, Seckers has not alleged that he or the crew were not unconditionally entitled to be paid for the hours they worked in accordance with their employment agreement. Under these circumstances, there do not appear to be any considerations of policy that would entitle the seaman to an award to which his employer would not be entitled. *See Nunley*, 863 F.2d at 1200 (An individual is not entitled to a salvage award where, acting in his official capacity as an employee, his actions were "part of the services which his company . . . had contracted to provide.").

Nevertheless, there is authority for the proposition that "[c]ontracts for salvage services are always reviewable by the courts and an award may be made of more or less in order to do justice according to the facts and circumstances of each case." *McKnight v. New Orleans Coal & Bisso Towboat Co.*, 39 F.2d 457, 458 (5th Cir. 1930). But, as the Court of Appeals for the Fifth Circuit observed, unless extraordinary services are rendered, this rule "will not prevent holding the salvor

to his contract, and this is true in respect of the crew as well as the owners of the vessel." *Id.*

Turning to the facts in the case before it in *McKnight*, where the members of the crew were compelled to waive their claim for salvage against their employer as a condition of their employment, the Court of Appeals observed:

> [T]he crews of the tugs performed no services other than those contemplated when the voyage was begun. They received their ususal wages for the services they performed. They were not exposed to any danger not usual and incident to their calling, and the floating and subsequent towing of the stranded vessels presented no extreme difficulty and was easily accomplished.

*Id.* Under these circumstances, the salving crew members were not entitled to receive a salvage award beyond the hourly rate at which they were employed. *Id.* By contrast, in *Baker Salvage Co. v. The Taylor Dickson*, 40 F. 261 (D.C. Va. 1888), a salvage award was made to the master and crew of a tug even though the owner of the tug was denied such an award because the latter was obligated by its contract with the owner of the salvaged vessel to provide the service. As the district judge explained:

> The ordinary business of the American Towing Company of Baltimore, of which the master and crew of the Sampson were employees, was that of towing in the Chesapeake bay, and the rivers and harbors tributary to the bay. Their contract with the company was in contemplation of such service,- that of towing vessels within the capes. As long as the Sampson was employed in these inland waters, no extraordinary labor, skill, or risk was involved; but, when the owners of the Sampson authorized her to be sent outside of the capes, on extraordinary service, down the coast in stormy weather, for the purpose of rescuing a vessel in distress, and in fact engaging in a wrecking and salvage service, all without consulting the crew of the Sampson, there arose . . . an implied permission on the part of the owners to the crew to demand and receive the usual proportion of whatever salvage money might accrue from such expedition.

*Id.* at 268.

Similarly in *The Dumper No. 8*, 129 F. 98 (2d Cir. 1904), the tugboat Ivins was dispatched out to heavy windswept seas in freezing weather to assist the disabled Dumper No. 8. The service

it was called upon to provide entailed "risk to the tug of collision with the dumper, and risk of drowning to any one attempting to board the dumper." *Id.* at 98. The work the crew signed on for on the Ivins was properly held not to involve any "obligation to risk their lives and the safety of the tug in an attempt to rescue the dumper. The mate volunteered, the master acquiesced, and all voluntarily participated in the danger incident to the marine peril." *Id.* at 99. *Cf. Lago Oil & Transp. Co. v. United States*, 218 F.2d 631, 633-34 (2d Cir. 1955) (A tug acting under a pre-existing contract may collect a salvage award for services that "were beyond anything reasonably called for by the contract." (citing *The Connemara*, 108 U.S. 352 (1883))); *The Joseph F. Clinton*, 250 F. 977, 979 (2d Cir. 1918) ("For services outside the contemplation of the parties in making the contract for towage, remuneration may be given, and, if they amount to salvage, a salvage award is due.").

The services rendered in the present case by Robert Seckers and other members of the crew of the *Dorothy J* after it was ordered to assist in pushing on the *Barberi* to keep it in place at the ferry slip in the waters of New York Harbor – a short distance from where it was already performing work for the City – are comparable to the efforts of the crew in *McKnight* and precisely the opposite of the efforts rendered by the master and crew in *Baker Salvage Co* and *The Dumper No. 8.* Significantly, Seckers does not allege that the work he performed on the *Dorothy J*, during the period at issue, differed from the work that he was hired to do as a member of the *Dorothy J*'s crew. Moreover, he and the crew of the *Dorothy J* received compensation for the work they performed during that period, "they were not exposed to any danger not usual and incident to their calling," and the assitance they rendered "presented no extreme difficulty and was easily accomplished." *McKnight*, 39 F.2d at 458. Indeed, the effort expended to maintain the *Barberi* in place in the ferry slip, during which one assumes that the crew took turns sleeping, may have required less work than

towing a vessel in the crowded waters of New York Harbor.  As one of the claimant's attorneys at oral argument "conced[ed,] . . . tugboats that rescue anything in any salvage situation do what tugboats do.  They push, they pull, they put lines up, tow, they maneuver."  Hr'g Tr. at 28:20-23. Under these circumstances, Seckers is not entitled to a salvage award for that work.

Moreover, to the extent that he would be entitled to a salvage award for the period at issue, the amount of the award would be nominal.  As the Second Circuit has held: "The mere towing to safety a drifting barge or scow is usually regarded as salvage service of a low order of merit, and is compensated by a small award.  It has long been settled in [the Second Circuit] that salvage services rendered in harbor cases, where tugs are abundant and on the ground or near by are not services of a high order."  *The High Cliff*, 271 F. 202, 202 (2d Cir. 1921) (internal citations omitted).

## Conclusion

The services rendered to the *Barberi*, after the City ordered the *Dorothy J* to assist in holding the *Barberi* in place, which occurred within thirty-five minutes after the *Dorothy J* began rendering assistance, were covered by the contract.  The City's motion for summary judgment on this aspect of the claimants' salvage claim is granted.  On the other hand, the motions for summary judgment of Henry Marine and Robert Seckers are granted to the extent that they seek a salvage award for the spontaneous assistance they rendered to the *Barberi*, without any order from the City, in the immediate aftermath of the collision.   Seckers and Henry Marine are entitled to a single salvage

award for those services.  *See* Martin J. Norris, *The Law of Salvage* §§ 48, 57 (1958).  The amount and manner in which this award is divided between Henry Marine and Seckers is a matter which is beyond the scope of the motion and cross-motion for summary judgment.

**SO ORDERED:**

Brooklyn, New York
February 14, 2008

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge