FILED
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 18 2008 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JAMES MCMILLAN,

        Claimant

-against-

THE CITY OF NEW YORK.

-----------------------------------------------------------x

ORDER, JUDGMENT,
FINDINGS OF FACT
AND CONCLUSIONS
OF LAW

03-CV-6049
08-CV-2887

JACK B. WEINSTEIN, Senior United States District Judge:

## I. Introduction

Claimant was injured in a crash of a ferryboat operated by the City of New York. It has been determined that the City was negligent and is not entitled to limitation of damages under admiralty law. *In re City of New York*, 475 F. Supp. 2d 235 (E.D.N.Y. 2007), *aff'd*, 522 F.3d 279 (2d Cir. 2008).

The issue of damages was tried by a jury selected using the practice for constitutional juries and the trial was conducted as if a jury was required. Under admiralty law this was, however, an advisory jury. *See* Fed. R. Civ. P. 38(e) (no required jury in maritime claim). *Cf. NAACP v. AcuSport Corp*, 226 F. Supp. 2d 391 (E.D.N.Y. 2002) (procedure in using an advisory jury). The jury's verdict was $22,945,168 for past and future damages. The court accepted some, but not all of the jury's findings, awarding a total of $18,278,000.00 (rounded off from $18,277,968.69), as explained below in the court's findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1) (requiring findings of fact and law in cases tried with an advisory jury). Set forth below are those findings.

1



## II.  Findings of Predicate Facts

1. James McMillan was born on January 2, 1964. He is presently forty-four years old. *See* Tr. pg 462, lines 11-14; Defendant's exhibit 7.

2. The City of New York, a duly incorporated municipal corporation organized under the laws of the State of New York, was the owner and operator of the M/V ANDREW J. BARBERI ("BARBERI"). *See generally* Pleadings.

3. On October 15, 2003, Mr. McMillan was a passenger on the BARBERI's trip from Whitehall Street in Manhattan to the Staten Island Ferry Terminal in St. George, Staten Island. The time of departure was 3:00 p.m. *See* Tr. page 463, lines 8-9.

4. At approximately 3:20 p.m., the BARBERI collided at full speed with a concrete maintenance pier at the Staten Island Ferry Terminal, causing numerous injuries and deaths to passengers. *See generally* Pleadings.

5. Mr. McMillan was lawfully standing near the bow of the BARBERI when the accident occurred. He was knocked down and struck in his neck by debris. *See* Tr. page 464, line 16 – page 466, line 1.

6. He was unable to move. *See* Tr. page 466, line 2 – page 467, line 2.

7. Mr. McMillan was strapped onto a board by members of the Fire Department and taken to an ambulance. He was in severe pain, frightened and distraught. *See* Tr. page 468, line 5 – page 469, line 12.

8.  The ambulance delivered Mr. McMillan to the Staten Island University Hospital Emergency Department with complaints of neck pain, right shoulder pain and bilateral lower extremity paresthesia. *See generally* Claimant's exhibit 2.

9.  He underwent a CT scan and MRI, revealing traumatic subluxation and fracture at C6-C7 with a right side C6 laminar fracture and a C6 pedicle fracture. He had no sensation from the shoulders down. *See generally* Claimant's exhibit 2.

10. On October 20, 2003, Mr. McMillan underwent surgery for open reduction of a C6-C7 fracture with decompression of the spinal cord, a posterolateral fusion with local autograft and posterior multi axial screws which connected the bars in between C5, C6, C7 and T1. *See generally* Claimant's exhibit 2.

11. Post-operatively, Mr. McMillan's neurological examination showed no significant improvement, except that his neck pain was reduced. During the course of recovery, he developed bilateral lower extremity deep vein thrombosis which required anticoagulation and the installation of a Greenfield filter. *See generally* Claimant's exhibit 2.

12. On October 26, 2003, Mr. McMillan was intubated and placed on a ventilator secondary to bilateral effusions and nosocomial pneumonia. *See generally* Claimant's exhibit 2.

13. On November 4, 2003, he was transferred to Mount Sinai Hospital for rehabilitation. *See generally* Claimant's exhibit 2; Claimant's exhibit 67. Dr. Adam Stein, Mr. McMillan's attending physiatrist at Mount Sinai Hospital, diagnosed a C6 ASIA A tetraplegia. *See generally* Claimant's exhibit 67.

14. Dr. Jonathan Vapnek, a urologist affiliated with Mount Sinai, was consulted for evaluation and management of Mr. McMillan's neurogenic bladder. A cystoscopy revealed significant inflammation with debris in the bladder, but no evidence of tumor and no stones. A renal bladder ultrasound was normal. *See generally* Claimant's exhibit 67.

15. At Mount Sinai Mr. McMillan participated in physical therapy and occupational therapy. *See generally* Claimant's exhibit 67.

16. Upon discharge on February 3, 2004, he required supervision with eating, upper body dressing, and powered mobility in a wheelchair. He required help for transfers, toileting and showering and for lower body dressing. His arms could be moved by another person through their entire range of motion. He had right shoulder motion, right elbow flexion, some elbow extension, some forearm flexion and wrist flexion, but no finger motion. With respect to his left arm, he exhibited motion in his shoulder, elbow flexion, elbow extension, forearm and wrist extension and flexion and some finger flexion and extension. He had no hip, knee or ankle strength in either leg. He had a Texas catheter in place and his bowel regimen was every other day, for which he required total assistance. *See generally* Claimant's exhibit 67.

17. Mount Sinai Hospital recommended outpatient physical and occupational therapies. *See generally* Claimant's exhibit 67.

18. For home health care, Mr. McMillan hired persons from his community, whom he knew and recommended to the Chinese-American Planning Council Home Attendant Program, which approved the aides on a twenty-four hours per day, seven days per week basis; they were paid minimal fees for their services. *See* Tr. page 476, lines 7-17; page 502, lines 7-10. These untrained home care health aides provided – and still provide – personal care activities such as

bathing, dressing, toileting, transferring and mobility. They also prepare meals and do housekeeping. *See* Tr. page 504, line 10 – page 507, line 7.

19. Beginning on August 30, 2004, the Visiting Nurse Service provided skilled home nursing services to Mr. McMillan for physical and nutritional assessment, catheter care, wound-decubitus care, education and medical instruction. These services were initially provided one to three times per week, and more frequently as needed for complications. The services were prescribed by Dr. Lois Saltzman, his treating physician. There were significant periods when required nursing maintenance was not performed. Nurse services were sometimes supplied to deal with emergencies, such as stage II bedsores, blood in the suprapubic tube, clogging of the suprapubic tube, urinary tract infections, and occasional autonomic dysreflexia. *See generally* Claimant's exhibit 74.

20. Between May 10, 2005 and June 16, 2006, Mr. McMillan attended seventy-four physical therapy sessions at the Mount Sinai Rehabilitation Center. They consisted of strengthening, a form of simulated "gait" training, range of motion and balance training, orthotic training, postural re-education and caregiver instruction. *See generally* Claimant's exhibit 67.

21. Mr. McMillan made minimal progress towards goals of standing and simulated ambulating with a reciprocating gait orthosis and a walker. He was able to stand and move with extreme effort only for short distances with full assistance and a removable body cast. *See generally* Claimant's exhibit 67; *see also* Video of court demonstration.

22. After its first installation in August 2005, he had his suprapubic tube changed approximately every six weeks at the Mount Sinai Hospital Ambulatory Surgery Department or at the Mount Sinai Medical Center Urology Department. *See generally* Claimant's exhibit 67.

23. Between July 18, 2006 and November 21, 2006, Mr. McMillan attended twenty-seven physical therapy sessions for "gait" and other training at the Mount Sinai Diagnostic and Treatment Center. Assistance included instruction for aides. He was discharged on November 21, 2006. *See generally* Claimant's exhibit 67.

24. Accompanied by an aide, Mr. McMillan vacationed in Florida. He had a serious burn injury as a result of being lowered into a tub of water that was too hot. When he returned, he was treated by Dr. Saltzman for the burns. *See* Tr. page 375, line 15 – page 376, line 11; Claimant's exhibit 1.

25. On November 22, 2006, a urodynamic study was performed on Mr. McMillan in order to assess bladder and urethra function. After the instillation of 20 cubic centimeters of saline, approximately one ounce, he had a severe headache and his blood pressure increased to 200/110. The procedure was terminated, his bladder was emptied and his blood pressure returned to normal. *See generally* Claimant's exhibit 67.

26. Considering Mr. McMillan's lifestyle and the spastic nature of his bladder, the urological team at Mount Sinai decided that a suprapubic tube would be preferable to intermittent catheterization. The latter would require inserting a catheter through the penis and into the bladder four to six, or perhaps more, times per day. *See generally* Claimant's exhibit 67. Contrary to the advice of the urologists at Mount Sinai and the opinion rendered by Dr. Vapnek, Dr. Saltzman advocated using intermittent catheterization because she believed it resulted in less frequent urinary tract infections and a lower risk of squamous cell cancer. *See* Tr. page 221, line 5 – page 223, line 22.

### III. Conclusions of Law

1. Claimant should be awarded a sum that will fairly and justly compensate him for any damages he sustained as a result of the accident. The dollar amount should be paid immediately. Since the injury in this matter occurred to a passenger on a ferry on navigable waters, the damages in this matter should be determined in accordance with General Maritime Law. *The Admiral Peoples*, 295 U.S. 649 (1935). Under General Maritime Law, passengers may recover pecuniary losses proximately caused by the fault of the shipowner, including past and future medical expenses. *Cf. Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983). The passenger may also recover damages for past and future pain and suffering. *Cf. Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742 (2d Cir. 1988).

2. No loss of earnings is to be included in this case. The claimant agreed to forego such a claim to avoid evidence of reduced earning capacity that might have prejudiced his case. *See* Fed. R. Evid. 401-403.

3. No consideration may be given to possible tax consequences. Restatement (Second) of Torts § 914A (1965).

4. In determining damages, no consideration may be given to attorneys' fees or the cost of the litigation. Restatement (Second) of Torts § 914 (1965).

5. The claimant has the burden of proving his claims by a preponderance of the evidence.

6. The following are the elements of damages:

    a. The amount reasonably expended by the claimant for medical treatment from the date of the accident, October 15, 2003, to August 25, 2008, the date the trial began.

b. A reasonable amount for claimant's past pain and suffering that will fairly and justifiably compensate him. Compensable pain and suffering includes the sensation of physical pain and the inconvenience and sense of loss that may result from physical injury. Unpleasant emotional reaction to the injury or its consequences, such as fright and frustration at loss of body control, should be included. The accident must be a substantial factor in bringing about claimant's pain and suffering.

c. The claimant's life expectancy from August 25, 2008 should be determined without reference to "race." *See* Tr. page 1062, line 14 – page 1067, line 19; Part V, paragraph 12, *infra*. The mortality tables may be considered together with all other evidence in determining how long the claimant may be expected to live. Life expectancy, as shown by a mortality table or calculation, is merely an estimate of probable average ages of death.

d. The type of medical and other care claimant has required and probably will require should be determined.

e. How much will be required to pay now for items in paragraph d until the probable end of life as determined in paragraph c should be determined. In deciding this amount, the projected growth (inflation) rate or rates reasonably applicable should be taken into account.

f. The pecuniary losses should be discounted to present value. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 532 (1983). Since the total amount awarded will be paid now, the court should apply a reasonable discount rate for money to

    be invested now, at least reasonable risk, that will provide the amount needed to continue payments for claimant's medical and ameliorative needs to his estimated projected end of life as determined in paragraph c.

  g. A reasonable amount for pain and suffering from August 25, 2008 to claimant's probable date of death as determined in paragraph c, should be awarded that will fairly and justifiably compensate him, adjusted as in paragraph e for the reduced value of future money (inflation), with a discount rate to provide annual payments as found in paragraph f. The discount rate for future pain and suffering damages does not have to be calculated with great precision, but must take the reasonably estimated time value of money into account. *Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742, 751 (2d Cir. 1988).

## IV. Fees

1.  Claimant's attorney seeks a fee of 33 1/3% on the recovery, after deductions for expenses. The fee should be limited to 20% in this case. That percentage is generous and sufficient under the circumstances. The rules of the New York State Judicial Department where claimant's attorney is registered provide that either a sliding scale (50% on the first $1,000 of the sum recovered, 40% on the next $2,000 of the sum recovered, 35% on the next $22,000 of the sum recovered, 25% on any amount over $25,000 of the sum recovered) or fee of one third of the award represents the upper limit of a "fair and reasonable" fee in a personal injury action. Appellate Division, First Department, Rule 603.7(e).

2.  While claimant's counsel was excellent, the fee requested is excessive under the special circumstances of this case.

3.      There was reduced risk to the claimant's attorney in this case. The issue of liability had already been decided under the leadership of other counsel.

4.      The court gave claimant's attorneys the opportunity to submit litigation hours for a lodestar analysis for comparative or other fee purposes. *See Mar Oil, S.A. v. Morrissey*, 982 F.2d 830 (2d Cir. 1993); Am. Law. Inst., *Principles of the Law of Aggregate Litigation, Preliminary Draft No. 5* § 3.13 (Sept. 12, 2008) (not yet presented for approval by A.L.I.) ("A number of courts require or permit the lodestar method to be used as a cross-check against the percentage calculation, and this Section endorses that approach at the discretion of the trial court"); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (approving cross-check); Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 Geo. J. Legal Ethics 1453, 1455-64 (2005) (same). Claimant's attorney failed to submit any time records. There was no basis for a multiplier.

5.      In this district there have been permitted attorneys' fees of one third in cases related to the Staten Island Ferry crash where the total amount awarded was far smaller than in the instant case. *See, e.g., William Castro, Jr. v. City of New York*, No. 03 Civ. 6088 (E.D.N.Y. Nov. 21, 2006) ($3,000,000 settlement); *Osseritta Robinson v. City of New York*, No. 03 Civ. 6049 (E.D.N.Y. May 30, 2008) ($1,375,000 settlement).

6.      In the *Healy* wrongful death case arising from the same ferryboat crash, there was an award of $8,750,000. A fee of 20% was allowed. Settlement discussions in the case were highly complex. *See Estate of John Healy v. City of New York*, No. 08 Civ. 2885, Tr. of Settlement Hearing (E.D.N.Y. Aug. 2008).

7. The issue of fees is a discretionary matter on which views of judges may differ. This court exercises its discretion to protect the claimant, a person with limited education who was not capable of an arms-length fee negotiation. In view of the decision on the fee and the services rendered, it is not necessary to determine whether, under the circumstances, the retainer agreement is enforceable.

8. The contingency fee in this case is limited to 20% of the net award, with deductions for expenses.

9. As part of the fee, adequate controls should be devised by counsel and approved by the court to protect the award against misuse or predacity.

## V. Findings of Fact Controlling Damages

1. Mr. McMillan's lifestyle will not accommodate the use of intermittent catheterization. Catheterizing intermittently during the day every four to six hours, and frequently at night, would significantly impede Mr. McMillan's active lifestyle. *See* Tr. page 624, line 18 – page 626, line 14; page 636, lines 11-20; page 700, line 17 – page 701, line 8. Studies are not conclusive on a higher incidence of squamous cell cancer and, in any event, the reported incidence of that cancer does not show a significant increase with the use of suprapubic catheters. *See* Tr. page 634, line 16 – page 636, line 10.

2. Intermittent catheterizations are commonly used by paraplegics rather than quadriplegics, since paraplegics can usually learn to catheterize themselves with minimal intrusion on their quality of life and privacy. *See* Tr. page 644, lines 1-12. Quadriplegics need full assistance in catheterizing. Since it is an invasive procedure, it should only be performed by a licensed

11

practical nurse. *See* Tr. page 641, line 16 – page 642, line 3. If Mr. McMillan needed intermittent catheterizations, he would probably require licensed practical nursing care on a twenty-four hours per day, seven days per week basis.

3. Dr. Saltzman's medical recommendation for intermittent catheterization is unpersuasive. The Mount Sinai urological team's contrary conclusions were well founded and superior to those of Dr. Saltzman. Mr. McMillan is likely to continue the use of the suprapubic tube. He does not need to have licensed practical nursing care on a twenty-four hours per day, seven days per week basis.

4. Mr. McMillan's trips to the emergency room for periodic treatment do not necessitate licensed practical nursing on a twenty-four hours per day, seven days per week basis, as recommended by Dr. Saltzman. Between September 29, 2004 and January 26, 2007, Mr. McMillan presented eight times to the Mount Sinai Emergency Room Department for bronchitis, penile laceration from the Texas catheter, suprapubic tube replacement and flush, and an abscess; and two times for urinary tract infections. Occasionally, he had symptoms of autonomic dysreflexia. On January 28, 2007, he was brought to Mount Sinai Hospital Emergency Department with complaints of abdominal bloating. He also had a malfunctioning suprapubic tube, which has been fully corrected at Mount Sinai on a permanent basis. His diaphoresis and hot flashes, or symptoms of autonomic dysreflexia, did not require a trained nurse. *See generally* Claimant's exhibit 67.

5. Regular skilled nursing care for eight hours per week by a licensed practical nurse will suffice, minimizing emergency room visits. The licensed practical nurse that sees him will be able to detect and treat decubitus ulcers, urinary tract infections, blocked suprapubic tubes, bowel

12

Case 1:08-cv-02887-JBW-VVP   Document 59   Filed 09/18/08   Page 13 of 19 PageID #: 248

or bladder difficulties, upper respiratory or other infections, and to investigate any instances of autonomic dysreflexia. These problems can be reported by a home care health aide. The nurse can check on the effect of his medications and determine if he is taking ordered medications. The nurse can report any significant findings to Mr. McMillan's physiatrist, who will see him as needed, once a month for the rest of his life. *See* Tr. page 872, line 11 – page 873, line 21; page 991, line 24 – page 992, line 5.

6.   Mr. McMillan has benefited from physical therapy. He may profit somewhat from further therapy. He terminated formal physical therapy services in November 2006 when he went on vacation. He returned to physical therapy from February 1, 2007 to March 29, 2007 for "gait" training, strengthening and therapeutic exercise. *See generally* Claimant's exhibit 67. He also attended forty-four physical therapy sessions at NYU Rusk Institute of Rehabilitative Medicine between May 9, 2007 and October 29, 2007. He engages in some physical therapy at home, working with a bowflex and weights. *See* Tr. page 503, line 12 – page 504, line 5; page 508, line 25 – page 509, line 13.

7.   Mr. McMillan's physical therapy needs will be one time per week on average. While he may initially require more frequent help, those sessions will be terminated as he reaches maximum medical improvement. They can resume when his physical status changes and he needs further assistance.

8.   Dr. Saltzman's care for Mr. McMillan has been commendable. Her recommendation for treatment is not credible. *See* Part V, paragraphs 1-2, *supra*. Dr. Saltzman is not an expert in life care planning and her life care plan is not credible. The City's expert on life care plans, Sharon Reavis, has years of experience in recommending life care plans and furnished appropriate and

13

accurate details regarding costs and suppliers. She provided the thorough and accurate research that was missing from Dr. Saltzman's recommendations.

9.    Ms. Reavis' life care plan is applicable, with the additions of a van every five years for life, at the cost of $30,000, and eight hours of skilled nursing care per week rather than the six hours of skilled nursing care per week that she recommended. Both of these additional costs have been adjusted in accordance with the growth rate provided by Dr. Goldman and the interest rate furnished by Dr. Seplaki. They are embodied in the total damage award.

10.    The cost growth rates as testified to by Dr. Goldman are accurate. They should be applied as follows: a) aids to independent function, 1%; b) prescription items, 4%; c) non-prescription items, 2%; d) therapy and case management, 3.4%; e) medical care, 4%; f) transportation, 3.4%; and g) home care services, 3.4%.

11.    The discount rate to be applied to the calculation of the present value of these future needs is 4.867%, as testified to by Dr. Seplaki.

12.    Mr. McMillan's life expectancy is 24.9 years. The court affirms the finding of the advisory jury on life expectancy, on the basis of the testimony and evidence, having disregarded all "race"-based computations and applied predictions for the general male population, and particularly those suffering from quadriplegia. *See* Tr. page 800, line 1 – page 810, line 1; page 1062, line 14 – page 1067, line 19. An opinion on the subject of race and life expectancy will be issued shortly.

13.    The medical and other care provided to Mr. McMillan will be the same as, or better than, that afforded male quadriplegics in the general population. He has an extraordinarily intense will

to live and better than average underlying physical strength and agility. He retains his zest for life. These factors will probably extend his expected life span to that found by the jury.

14. Mr. McMillan's damages related to his future needs are those calculated by witness Sharon Reavis and adjusted for by witness Dr. Seplaki's discount rate and witness Dr. Goldman's cost growth rates. *See* Dr. Goldman's letter to Kenneth Sasmor of the City of New York dated September 12, 2008 and made a part of these findings; Tr. *passim*. These findings are based upon a favorable assessment of the credibility of these witnesses. The amounts required for future medical care based on this testimony are summarized below:

| Items | Present Value |
|---|---|
| Aids to independent function | $47,371 |
| Prescription items | $127,968 |
| Non-prescription items | $192,229 |
| Therapy and Case Management | $183,050 |
| Medical Care | $156,706 |
| Transport Requirements Costs | $231,476 |
| Home Care Services | $4,596,653 |
| Lump Sum Items | $57,346 |
| | |
| Life Time Total | $5,592,799 |

15. The parties agree that necessary and reasonable medical expenses incurred in the past by Mr. McMillan are $685,169.69. *See* Tr. page 1424, lines 16-19.

16. The award for past pain and suffering should be rounded off from the jury award to $4,500,000. The award for future pain and suffering, as already discounted by the jury, should be rounded off from the jury award to $7,500,000. The jury, a cross section of this community, is particularly qualified to assess these elements of damages. The amounts are not subject to precise mathematical computation. *See Geressy v. Digital Equipment Corp.*, 980 F. Supp. 640,

655-56 (E.D.N.Y. 1997) (noting difficulties in quantifying pain and suffering). The court would have itself found these rounded off amounts appropriate even without a jury trial.

17. Similar pain and suffering awards for paralysis have been awarded by juries and courts across the country. In *Cruz v. Long Island Rail Road Company*, 803 N.Y.S.2d 91 (N.Y. App. Div. 2d Dep't 2005), the jury awarded plaintiff, a T12/L1 paraplegic, $10,000,000 for past pain and suffering for three years and $18,000,000 for future pain and suffering for 18.2 years. On appeal, the Second Department sustained $3,000,000 for past pain and suffering and $9,000,000 for future pain and suffering. Mr. McMillan is a quadriplegic and therefore his injury is more severe than that of the plaintiff in *Cruz*. *See also Heikkinen v. United Services Auto. Ass'n*, 724 N.W.2d 243 (Wis. Ct. App. 2006) (sustaining jury award of $10,000,000 for past pain and suffering for three years and $5,000,000 future pain and suffering for an 82-year old quadriplegic); *Okraynets v. Metropolitan Transportation Authority*, 555 F. Supp. 2d 420 (S.D.N.Y. 2008) (reducing jury award to T12 paraplegic of $5,000,000 for past pain and suffering for less than two years and $15,000,000 for 39 years to $2,500,000 for past pain and suffering and $8,000,000 for future pain and suffering); *Miraglia v. H & L Holding Corp.*, 828 N.Y.S.2d 329 (N.Y. App. Div. 1st Dep't 2007) (awarding $5,000,000 for past pain and suffering for five years for a 45-year old paraplegic and $5,000,000 for future pain and suffering); *Ruby v. Budget Rent A Car Corporation*, 806 N.Y.S.2d 12 (N.Y. App. Div. 1st Dep't 2005) (reducing award to $2,000,000 for past pain and suffering and $8,000,000 for future pain and suffering for a 25-year old paraplegic). The award in this case is commensurate with the above decisions.

18. Recent quadriplegic awards in amounts less than awarded here by the jury were reduced by the New York Appellate Division. In *Brown v. City of New York*, 713 N.Y.S.2d 223 (N.Y. App. Div. 2d Dep't 2000), two brothers, 26 and 27 years old, dove off a pier and were rendered

quadriplegic and pentaplegic. The Appellate Division reduced the award to each brother for past and future pain and suffering from $10,000,000 to $4,000,000. In *Driscoll v. New York City Transit Authority*, 691 N.Y.S.2d 110 (N.Y. App. Div. 2d Dep't 1999), a 19-year old man was struck by a subway train and suffered quadriplegia. The jury awarded him $10,000,000 for past and future pain and suffering. The Appellate Division reduced that award to $2,000,000. Cases involving paraplegics, brain damaged infants, and others are only remotely relevant in considering the jury's decision in the instant case. None of these cases controls the instant one, although they have all been seriously considered by the court.

19.     The court's independent assessment of the facts leads it to the conclusion that the jury's award for past and future pain and suffering was appropriate, not excessive, did not deviate from what would be considered reasonable compensation, and should be followed. The award for past pain and suffering is justified considering the trauma of the accident and the events immediately following; the fright and pain and psychic problems during the adjustment period require a high rate for pain and suffering during the past five years. The award for future pain and suffering is relatively modest, considering the long expected life of the claimant and his likely physical and mental deterioration over the years.

20.     There is insufficient reliable comparative data necessary to utilize statistical tests such as those of Professor Joseph B. Kadane's proposal for calculating excessive verdicts. *See* Joseph B. Kadane, *Calculating Remittiturs* (2008) (on file). In the absence of such information, the informed sense of the judge based upon experience, supported by an available sample, excluding outliers, and reliance on a responsible jury – here, one containing an actuary, an accountant, and mature taxpayers – supports the reasonableness of the awards for pain and suffering.

21. The total amount of claimant's damages is $18,277,968.69, computed as follows:

| Past pain and suffering | $4,500,000.00 |
|---|---|
| Past expenses | $685,169.69 |
| Future pain and suffering | $7,500,000.00 |
| Future expenses | $5,592,799.00 |
| | |
| Total | $18,277,968.69 |

## VI. Conclusion

Claimant is awarded $18,278,000.00, payable forthwith, with interest from today's date. In the court's discretion, no interest on past expenses or past pain or suffering is awarded since the total will give the claimant all that is required in the way of presently payable compensation. The City of New York may submit an order providing for a Medicare set-aside trust account.

It is ordered that the fee of 20%, as adjusted for expenses, be paid to the lawyer for the claimant now. The disputed fee amount of $2,500,000 (based upon the retainer agreement for a fee of 33 1/3%, as estimated after expenses) shall be placed in escrow to await an appeal or other disposition.

A stay of twenty days is granted so that any party can seek a more extended stay or other relief from the Court of Appeals for the Second Circuit.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   September 17, 2008
        Brooklyn, New York