UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

IN RE CITY OF NEW YORK, AS            **REPORT AND**
OWNER AND OPERATOR OF THE             **RECOMMENDATION**
M/V ANDREW J. BARBERI,                CV-03-6049 (ERK)(VVP)


-------------------------------------------------------x

The firms of Bosco, Bisignano & Mascolo, as liaison counsel, and Dougherty, Ryan,

Giuffra, Zambito & Hession, as maritime counsel, (collectively "the movants") have made a

motion for an award of attorneys' fees to be paid to them by counsel for the other claimants

in this action in compensation for their efforts in creating a common benefit for all

claimants. The motion has been referred to me for a report and recommendation by Judge

Korman.

## BACKGROUND

This case arose out of the disastrous wreck of the Andrew J. Barberi (the "Barberi" or

"Ferry"), a vessel operated by the City of New York to provide ferry service between

Manhattan and Staten Island. The wreck occurred on October 15, 2003 when the assistant

captain who was piloting the vessel either lost consciousness or situational awareness and

failed to control the Ferry as it approached the St. George ferry terminal on Staten Island at

its full speed of approximately 16 to 18 miles per hour. As a result, the Ferry struck the

maintenance pier at the terminal, tearing a 210-ten foot gash in the main deck on the

starboard side of the vessel. The collision killed eleven passengers and injured scores more.

Seeking to limit its exposure to claims for damages for the injuries and deaths that

resulted from the wreck, the City filed this action on December 1, 2003 pursuant to federal

maritime law, which in some circumstances permits vessel owners to limit their financial

liability in casualty cases to the value of the vessel. *See* 46 U.S.C. §§ 30501 *et seq.* (formerly 46

U.S.C. §§ 181 *et seq.*). Upon publication of the notice of the City's limitation action that is

required by the law, numerous claimants filed claims for compensation for their injuries with

the court. The limitation action thus had the effect of consolidating essentially all of the

claims asserted by the victims of the wreck in this court.  In all, more than 180 claims for personal injuries and wrongful death were made, as well as salvage claims by the owner and crew members of a vessel that came to the aid of the Ferry.[1]

At the first conference with the court, held on April 1, 2004, the court announced its view that for purposes of case management the claimants' attorneys should act through designated representatives and encouraged the various claimants' attorneys to reach agreement on the attorneys who would act as spokespersons for the group.  Although several attorneys voiced initial objections to the concept, after several additional conferences with the court, the claimants' attorneys eventually submitted to the court a Case Management Order which identified Anthony Bisignano of Bosco, Bisignano & Mascolo as Liaison Counsel and Sanford A. Rubenstein of Rubenstein & Rynecki as Co-Liaison Counsel who would act on behalf of all claimants.  The Order also named John J. Hession and James E. Ryan of Dougherty, Ryan, Giuffra, Zambito & Hession as Maritime Counsel for all claimants.  The Case Management Order was signed by the court on August 29, 2004. [DE 431].[2]  Subsequently, liaison and maritime counsel submitted to the court a plan concerning the formation of various committees and subcommittees of attorneys who would handle various aspects of the litigation on behalf of the claimants.  Although the plan, which has come to be known as the Committee Order, carried a signature line for Co-Liaison Counsel Sanford Rubenstein, he apparently never signed the document and has played a far more reduced role than Anthony Bisignano in interactions with the court.  The Committee Order was signed by the court on September 30, 2004.  [DE 734].

Although the discussions among the many counsel for the various claimants that led to the Case Management Order and the Committee Order explored the subject of compensation to be paid to liaison and maritime counsel, neither Order contained any

---

[1]Because of the peculiar procedural posture of the case, some of the claimants are referred to in various documents as third-party plaintiffs.  For ease of discussion, all persons who brought personal injury claims against the City in the action are simply referred to as claimants.

[2]"DE" refers to the docket entry where a document or other court event may be found.

provision concerning the matter. The Committee Order did carry a provision requiring the claimants' attorneys to contribute to a fund for the payment of so-called "liability expenses" which was to be maintained by liaison counsel.

As the litigation progressed during the ensuing six years or so, liaison and maritime counsel coordinated meetings with the various attorneys for the claimants and served essentially as lead counsel in conferences with the court. Early on, Sanford Rubenstein withdrew from involvement in liaison matters, leaving Anthony Bisignano as the principal spokesman on case management issues. In that capacity he coordinated various joint efforts, including production of discovery, dissemination of documents and other information concerning the case, scheduling and conducting meetings of attorneys, and producing evidence presentations. In August of 2005, a summary judgment motion seeking to dismiss the limitation action was filed by the claimants, with maritime counsel playing the leading role in the effort, assisted by liaison counsel and several other claimants' attorneys. Upon considering the motion, Judge Korman suggested, and the parties agreed, that evidence be submitted to permit him to decide the limitation issue by means of a trial on papers. Thus, after the submission of further papers Judge Korman issued findings of fact and conclusions of law denying the City's petition for limitation in February of 2007. Because the decision rested on express findings that the City was negligent in the operation of the Ferry, it exposed the City to liability for all damages suffered by the claimants.

The City promptly appealed. In the meantime, the issue of compensation for liaison and maritime counsel's efforts began to reemerge. Numerous claimants had reached settlements with the City both before and after Judge Korman's decision, producing attorneys' fees for those attorneys under their contingent fee arrangements with their clients. In June of 2007, liaison and maritime counsel filed a motion seeking to have the court fix a percentage of the recoveries obtained by claimants to be paid to them as their fees for the services they rendered for the common benefit of all claimants. The motion was withdrawn without prejudice several weeks later, however, while the appeal was being briefed, and the

movants continued to provide services benefitting all of the claimants not only in briefing the appeal, but also in other aspects of the case.

The Second Circuit affirmed Judge Korman's decision in March of 2008, and the claimants who had not yet settled then began the process of preparing their cases for individual trials concerning damages. Because there remained legal issues common to all claimants who had not yet settled, maritime counsel briefed those issues for the claimants. At the same time, liaison counsel coordinated efforts to obtain further evidence concerning damages, and to prepare evidentiary presentations for use by individual claimants in damages proceedings. Ultimately, trials were held with respect to a handful of the claimants, including one in which a claimant received a verdict in excess of $18 million in damages. All claims have now been resolved by trial or settlement. While a number of claims still remained open, however, the movants renewed the instant motion for an award of attorneys' fees.

## DISCUSSION

### I. COMPENSATION FOR LIAISON AND MARITIME COUNSEL

#### A. General Principles

The movants ask the court to direct that all claimants' counsel pay over to them a fair and reasonable percentage of their fees to compensate them for the efforts they undertook to benefit all claimants. Although numerous counsel have opposed the motion on a variety of grounds, there is significant legal and public policy support for awarding compensation to counsel, in consolidated litigations, for their work on behalf of a group of individually represented plaintiffs. It has long been held that, even in the absence of any agreement as to attorney's fees, the court's equitable power enables it to award costs to a party whose actions create a common benefit for those similarly situated. *See Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 166-67 (1939). The "common fund doctrine" rests on a theory of unjust enrichment and holds that those who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched by the successful litigant's success:

> The common-fund exception to the American Rule [, where parties generally bear their own costs of litigation,] is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust enrichment. The

exception applies where a common fund has been created by the efforts of a plaintiff's attorney and rests on the principle that "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."

Manual for Complex Litigation-4th ("MCL-4th") § 14.121 (4th ed. 2004) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)) (citations omitted).[3]  In common fund cases, a "fund" for recovery by a large number of individual plaintiffs is "created, increased or protected by successful litigation."  *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1017 (5th Cir. 1977).  In those cases, those who benefit from a judgment or settlement obtained by attorneys who did not represent them are required to share some portion of their recovery with those attorneys.  *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (lead counsel in securities class action was entitled to fees for their efforts out of the total recovery obtained for plaintiffs); *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993) ("a party who creates, preserves, or increases the value of a fund in which others have an ownership interest [may] be reimbursed from that fund for litigation expenses incurred,  including counsel fees").  In these cases, the unjust enrichment principle functions to prevent a potential free-rider problem:  "If lawyers considering representation of some but not all of a cluster of beneficiaries can recover compensation only from beneficiaries who actively retain them, claims will not be brought - even though meritorious - where the expected value of the gains for beneficiaries willing to participate can't generate adequate compensation for counsel (and thus enable the bringing of suit)."  *Consolidated Edison Co. of New York, Inc. v. Bodman*, 445 F.3d 438, 443 (D.C. Cir. 2006).  In making determinations about compensation for "lead" counsel, the work provided by other attorneys who contributed work of common benefit should also be taken into account.  *See id.*

---

[3] "To recover on a theory of unjust enrichment a plaintiff must prove that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Dolmetta v. Uintah National Corp.*, 712 F.2d 15, 20 (2d Cir. 1983); *see also Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).

The Manual for Complex Litigation recognizes the applicability of the common-fund doctrine in cases like this one, *i.e.* consolidated mass tort litigations where some attorneys are appointed to represent a larger group at specific stages of the litigation:

> A variant on the traditional common-fund case occurs frequently in mass tort litigation – in both class actions and large consolidations – where a separate fund to pay attorney fees is created as a part of a settlement. The court must distribute the fund among the various plaintiffs' attorneys, which may include class counsel, court-designated lead and liaison counsel, and individual plaintiff's counsel.

MCL-4th § 14.11. Of course, "[w]henever possible, settlement between the parties of the fee amount is encouraged. Where such settlement proves impossible, however, the district court is vested with broad discretion in determining the amount and distribution of the fee award." *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)); *see also Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992) (holding that district court that appointed lead and liaison counsel had the authority to determine the amount of their compensation); Manual for Complex Litigation-3d § 20.223 (3d ed. 1995) ("Whether or not agreement is reached, the judge has the authority to order reimbursement and compensation and the obligation to ensure that the amounts are reasonable.") (quoted in *In re San Juan Dupont Plaza Hotel Fire Litig.*, 111 F.3d 220, 230 n.8 (1st Cir. 1997)).

The decision in *Smiley v. Sincoff* demonstrates both the extent of the district court's discretion in applying these equitable principles and its responsibility for enforcing them. 958 F.2d 498 (2d Cir. 1992). There, the Second Circuit affirmed a fee structure for liaison counsel in consolidated death and passenger injury actions against airlines responsible for an airplane crash. In the district court, the magistrate judge appointed a committee of attorneys experienced in mass air disaster litigation to coordinate the liability aspects of the litigation on behalf of all the plaintiffs. *Id.* at 499-500. The judge entered a pre-trial order setting forth the committee's responsibilities and establishing a fee structure whereby the individual attorneys would contribute a portion of their fees into a fund to be divided among the committee members. The committee members themselves, however, were not required to contribute any portion of their fees to the fund. *Id.* One of the committee attorneys, Robert

Smiley, subsequently entered into a separate agreement with nineteen plaintiffs whereby Smiley was individually retained to represent those plaintiffs at the liability stage. As part of that agreement, Smiley alone would receive fees from those plaintiffs in an amount equal to what would otherwise have been contributed to the fund. *Id.* at 500. The district court held, and the Second Circuit affirmed, that this special fee arrangement was a violation of the pretrial order entered by the court. *Id.* at 501-02. There was no showing that Smiley provided any unique service to these plaintiffs since his work in the liability stage of the litigation was required of him as a committee member acting on behalf of all of the plaintiffs. *Id.* at 502. Smiley's contracted fee was distributed to all of the members of the committee. *Id.* at 501-02.

Thus in *Smiley* the Second Circuit both affirmed the district court's broad power to oversee fee distribution in a consolidated action and recognized that "generally fee arrangements ordered by district courts [should] attempt to compensate attorneys in accordance with the time and effort expended[.]" *Smiley*, 958 F.2d at 502. The court cited with approval cases where district courts "establish fee structures designed to compensate committee members for their work on behalf of all plaintiffs involved in consolidated litigation," "determine both the method of computation of fees and the method of distribution of a common fund among committee members," and "intervened to modify tentative fee agreements between the parties themselves, even if such agreements were arm's length transactions." *Smiley*, 958 F.2d at 501 (citing *In re Air Crash*, 549 F.2d at 1016, *In re Agent Orange Product Liability Litigation*, 818 F.2d 216, 226 (2d Cir. 1987), and *Jones v. Amalgamated Warbasse Houses, Inc.*, 721 F.2d 881, 884-85 (2d Cir. 1983)); *see also Farber v. Riker-Maxson Corp.*, 442 F.2d 457, 459 (2d Cir. 1971) (affirming district court order requiring that individual plaintiff's attorneys first ask appointed lead counsel to take action before filing a motion with the court); MCL-4th § 14.215 (district court is responsible for setting guidelines for the responsibilities and payment of designated counsel). The court can also order compensation either directly from the plaintiffs' recovery or as a portion of the individual attorney's fees. *See Smiley*, 958 F.2d at 500; *Walitalo*, 968 F.2d at 749-50; *In re Air Crash*, 549

F.2d at 1016; *In re Zyprexa Products Liability Litigation*, 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006). While the fee structures are ideally determined at the early stages of the litigation, they are often not finalized until after settlement. *See, e.g., Walitalo*, 968 F.2d at 744-45 (although counsel filed motions proposing calculation of fees early in litigation, court did not address fee structure until after many of the cases had settled).[4]

Public policy principles that promote efficient and fair litigation also favor awarding fees to the movants here. "By making manageable litigation that otherwise would run out of control [designated counsel serve the] interests of the court, the litigants, the other counsel, and the bar, and of the public at large, who are entitled to their chance at access to unimpacted courts." *In re Air Crash*, 549 F.2d at 1017. Providing designated counsel with compensation also promotes the purposes of Rule 42 of the Federal Rules of Civil Procedure which allow courts, in their discretion, to consolidate actions for purposes of trial or for other proceedings. The purpose of this procedure is to "permit trial convenience and economy in administration" as well as reducing court costs. *MacAlister v. Guterma*, 263 F.2d 65, 68 (2d Cir. 1958). While the appointment of designated counsel does not merge the cases or deprive any single plaintiff of the opportunity to raise his or her unique rights, it is often "the only effective means of channeling the efforts of counsel along constructive lines[.]" *Id.*

---

[4]Federal courts have also consistently held that court-appointed counsel in consolidated litigation should be afforded compensation for their work. *See, e.g., In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litigation*, 982 F.2d 603, 607 (1st Cir. 1992) (holding that it was a "proper exercise of judicial power" for court presiding over mass disaster litigation to serve notice to parties that it would eventually make a common fund fee award to remunerate members of the plaintiffs' steering committee for efforts on behalf of communal interests); *Walitalo*, 968 F.2d at 747 ("It is well established that courts can impose liability for court-appointed counsel's fees on all plaintiffs benefitting from their services.") (citing Manual for Complex Litigation 2d § 20.223 (1985)); *In re Air Crash*, 549 F.2d at 1016 ("We hold that the district court [has] the power to direct that the Committee and its counsel be compensated and that requiring the payment come from other attorneys was permissible."); *In re Zyprexa*, 467 F. Supp. 2d at 265 ("In a complex multi-party litigation, attorneys designated with responsibilities for actions beyond those in which they are retained may be compensated for their work not only by their own clients, but also by those other parties on whose behalf the work is performed and on whom a benefit has been conferred") (quoting *In re Worldcom, Inc. Sec. Litig.*, No. 02-CIV-3288, 2004 WL 2549682, at *2 (S.D.N.Y. Nov. 10, 2004)).

The cases here were not consolidated under Rule 42, but the limitation action effectively consolidated the claims in the liability phase in much the same way. It is absolutely in the public interest not to discourage attorneys from taking on the duties undertaken by liaison and maritime counsel here by ensuring rightful compensation for their efforts. *In re Air Crash*, 549 F.2d at 1012-13, 1016 ("The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation"); *In re Zyprexa*, 467 F. Supp. 2d at 266. *Cf. Walitalo*, 968 F.2d at 747 n.11 (parties could not avoid paying court-appointed counsel fees by filing a stipulation of dismissal because that would discourage counsel from taking on the liaison role).

### B.    Waiver

The opponents of the motion argue that, notwithstanding the above authorities favoring an award of fees, the movants are not entitled to fees in the circumstances presented here because they expressly or impliedly agreed to waive any claim for fees. Resolving that issue (as well as others discussed separately below) required the court to conduct an evidentiary hearing. Based on the evidence presented at the hearing the court makes the following factual findings concerning the waiver issue and the resulting legal conclusions.

At the urging of the court at the first conference in the case, counsel for various claimants began to discuss among themselves an organizational structure for collective effort in prosecuting the litigation. To that end a meeting was held at the Staten Island Bar Association on May 18, 2004 where, among other things, an extended and contentious discussion of the fees to be paid to liaison and maritime counsel took place. Although no precise attendance record was made, there is no dispute that many and perhaps most of the attorneys representing claimants in the case attended the meeting. Prior to the meeting Bisignano circulated to a number of the attorneys a draft of an organizational plan which provided for the formation of various committees of claimants' counsel to handle various

aspects of the litigation. Ex. K.[5] The draft also contained a provision for fees to be paid to liaison counsel and to the members of a proposed executive committee, and it was this provision that provoked the discussion.

Various attorneys spoke both for and against the collective payment of any fees to liaison counsel and executive committee members for the work they did on behalf of the group, but a substantial majority of those in attendance voiced opposition. At one point, when the fee discussion was apparently impeding agreement on the other aspects of the order, Sanford Rubenstein asked whether the group would agree to the proposed organizational plan if the fee provision was waived. This proposal gained the approval of a majority of the group, and was taken by some in attendance as an agreement by all that no fees would be sought by, or paid to, any attorneys who contributed efforts that benefitted the group. It is not entirely clear what Bisignano said about the matter at the meeting,[6] but Hession was adamant about the need to pay fees to those who served the group as liaison counsel or on the executive committee.

That the matter was not considered closed by Hession and Bisignano, however, is clear from ensuing events. Two days after the meeting, Hession sent a letter to other proposed members of the executive committee urging them, on behalf of himself and Bisignano, to "reconsider your recommendation that the members of the Executive Committee waive their right to seek an award of fees." Ex. R, p.1. An ensuing draft of the

---

[5]"Ex." refers to exhibits submitted at the hearing, and "Tr." refers to the transcript of the hearing. The movants and the respondents both submitted exhibits in connection with the hearing, the movants designating their exhibits with numbers and the respondents designating theirs with letters. Many of the documents were marked as exhibits by both sides, but for consistency and ease of reference the court will only cite to one party's exhibit throughout the opinion. The reader should draw no inference from the fact that one party's exhibit was chosen to be cited.

[6]One witness at the hearing, Jamie Minchew, testified that Bisignano said he would not be seeking fees from any other attorneys since he represented 50 or more claimants himself. Tr. 231. Another witness, Gary Mionis, was more equivocal, saying that Bisignano acquiesced on the fee issue but did not affirmatively waive fees. Tr. 199. Bisignano disputes this, however, Tr. 480-82, and other witnesses agree that Bisignano never said he was abandoning any entitlement to fees. Tr. 111, 274, 444-45.

organization plan, which came to be known as the Committee Order, continued to contain a provision for the payment of fees to liaison counsel and the executive committee, as well as to maritime counsel. Ex. S, ¶ I(G)(3), at 7. Agreement could not be reached on the fee provision, however, and the movants elected not to press the matter at the time because they did not want their clients or the public to know that there was dissension among counsel. Thus, the Committee Order ultimately entered by the court on September 30, 2004 contained no provision for the payment of fees to liaison counsel, the executive committee or maritime counsel.

On these facts, the court cannot find that the movants either agreed not to pursue fees for their efforts or that they waived their right to do so. There is certainly nothing in writing endorsed by any of the movants constituting an agreement in that regard. Under New York law, "waiver requires . . . the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184 (1982). "It may arise by either an express agreement or by such conduct or a failure to act as to evince an intent not to claim the purported advantage," but "cannot be inferred from mere silence." *Golfo v. Kycia Associates, Inc.*, 45 A.D.3d 531, 533, 845 N.Y.S.2d 122 (2d Dep't 2007). Here, there is no evidence that the movants voluntarily and intentionally abandoned any right they may have to seek fees for their efforts as liaison and maritime counsel. The only conduct from which that might be inferred is the silence of the Committee Order on the question of fees, a silence upon which waiver may not be based.

The respondents' argument that *In re San Juan Dupont Plaza Hotel Fire Litigation*, 111 F.3d 220, 228 (1st Cir. 1997), supports the finding of a waiver does not withstand scrutiny. They contend that the movants' failure to press the issue of fees when the Committee Order was presented to the court in 2004 bars them from raising the issue now. As the respondents themselves recognize, however, the court in *Dupont Plaza Hotel Fire Litigation* considered that "*all* litigants must share in their mutual obligation to collaborate with the district court *ab initio* in fashioning adequate case management and trial procedures, or bear

the reasonably foreseeable consequences for their failure to do so." 111 F.3d at 228 (emphasis added). Under the principle announced in that case then, it was equally the responsibility of both the movants and the respondents to bring the then-raging dispute concerning fees to the court's attention, and they both now must bear the reasonably foreseeable consequences of their failure to do so, to wit, a judicial determination of the dispute.

The respondents' promissory estoppel argument also fails because they have not established that they permitted the movants to perform liaison and maritime counsel work based on an express and unequivocal promise not to seek a share in the recoveries or legal fees. "In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Systems Development, Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (internal quotation marks and citation omitted); *see also Schwartz v. Miltz*, 77 A.D. 3d 723, 724-25, 909 N.Y.S. 2d 729 (2d Dep't. 2010). As discussed above, the respondents have failed to establish the first element, i.e., they have not presented the court with sufficient evidence of a clear and unambiguous promise, whether oral or in writing, not to seek fees.

### C. Timeliness of the Fee Application Under Rule 54

The respondents also argue that liaison and maritime counsel waived their request for fees by failing to file their claim within the time limits imposed by Rule 54(d)(2) of the Federal Rules of Civil Procedure. Rule 54 concerns a prevailing party's motion for attorney's fees and requires that the motion for fees be filed within fourteen days of the judgment. A "judgment" for the purposes of the federal rules is that which "conclusively determines the rights of the parties to the litigation and leaves nothing for the court to do but execute the order . . . or resolve collateral issues." *Weyant v. Okst*, 198 F.3d 311, 314 (2d Cir. 1999). The court finds that the movants have complied with Rule 54's timing requirements, or in the alternative, that their delay in filing their motion for fees is due to excusable neglect.

First, the respondents fail to identify the judgment that should have triggered the instant application, so it is not clear whether the movants failed to meet any applicable Rule 54 deadline. In making their argument, the respondents point to three dates as "now-historic facts [that constitute] the final possible judgment in the case for purposes of Rule 54": Judge Korman's February 26, 2007 order denying the City's limitation of liability claim, the Second Circuit's May 27, 2008 decision affirming that order, and September 19, 2008, the date Judge Korman marked the main case as closed. A relevant date ignored by the respondents is that the motion for fees was first filed in June 2007, before the Second Circuit rendered its decision and while common benefit work and work on many of the individual actions were ongoing. At the time the 2007 motion was filed, the respondents did not object to it as untimely. The 2007 motion was withdrawn shortly thereafter without prejudice to renewal due to ongoing negotiations of the fee issue and was not raised again until the filing of the instant application. *See* [DE 806, 816] There is good reason to view the 2007 application as timely. The decision on the limitation of liability, while an appealable order, did not conclusively determine all of the rights of the parties in all of the cases. Liaison and maritime counsel continued to do work on issues of common interest beyond the determination of the limitation of liability claim. There is also merit to the movants' argument that there was no judgment for Rule 54 purposes until all the claims had been resolved. In February 2007, when the original fee application had been filed, many of the individual cases were still pending and had not been reduced to "judgments" and no party had moved for "final" judgment. Indeed, the last case was not resolved until 2010, well after the current fee application was filed.[7]

_____

[7] The cases cited by the respondents on the other hand involved the application of the fourteen-day rule to a final judgment of settlement that resolved all of the plaintiffs' claims. *See In re Veritas Corp. Securities Litig.*, 496 F.3d 962, 974 (9th Cir. 2007) (attorneys' fee application was filed 29 days after entry of judgment of settlement of all of the claims); *In re Texaco Inc. Shareholder Derivative Litigation*, 123 F. Supp. 2d 169, 171 (S.D.N.Y. 2000) (attorney fee application was filed close to one year after amended judgment approving settlement of all claims).

Second, this case more closely resembles a class action where the parties are not subject to the fourteen-day rule. In class actions, the district court sets a specific date for the filing of a motion for attorney's fees under Rule 54. *See* Fed. R. Civ. P. 23(h); 5 Moore's Federal Practice § 23.124 (3d ed.) ("a strict 14-day limit could not possibly accommodate the varying factual situations in which motions for fees may be made in class actions"). As in many class actions, the movants here are not moving against the *defendants* for an award of attorney's fees in relation to a monetary judgment against them. Rather, they are moving for an equitable award in the form of a percentage of the individual plaintiffs' recoveries, similar to class action attorneys that move for a portion of the settlement amount. The purpose of Rule 54 is to give an adversary notice of the intention to move for fees in advance of the expiration of the time to appeal. 10 Moore's Federal Practice § 54.151 (3d ed.). As a corollary to that policy, in class actions, lead counsel are required to give notice to all class members before they can move for fees. 5 Moore's Federal Practice § 23.124 (3d ed.). Consistent with this practice, the movants were in discussion with the individual plaintiffs' attorneys from the outset, and notified the court in mid-2007 that they were postponing their motion for fees pending an effort to resolve the matter amongst themselves. *See* [DE 816] (Endorsed 7/11/2007 Letter withdrawing 6/27/07 Motion for Fees). In reliance on the parties' good faith efforts to resolve the matter, Judge Korman endorsed the withdrawal of the motion for fees "without prejudice to renewal." *Id.* That those negotiations failed, however, should not be a basis for denying the movants' fees as untimely made.[8]

Even if Rule 54's fourteen-day rule applied here and the movants violated it, there are significant considerations here that warrant the tolling of the fourteen-day period. Under Rule 6, a deadline imposed by the Federal Rules can be extended for good cause "with or without motion or notice if the court acts, or if a request is made, before the original time or

---

[8] The filing of the motion for fees in 2007 also distinguishes this case from those cited by the respondents where courts found that the fact that the adversary was aware of an intention to seek fees did not satisfy Rule 54's notice requirement. Here, the notice was not through informal discussions but through a formal motion to the court.

its extension expires" or "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed R. Civ. P. 6(b)(1) (A)-(B). The court has determined that the 2007 motion was timely, and therefore, under Rule 6, the decision to allow the movants to withdraw it without prejudice and subject to renewal due to ongoing negotiations constituted an extension that was granted for good cause under 6(b)(1)(A). Even if the 2007 motion could be considered as untimely, however, there is still excusable neglect present here under 6(b)(1)(B).[9] "To determine whether a party's neglect is excusable, a district court should take into account: '[1][t]he danger of prejudice to the [opposing party], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was in the reasonable control of the movant, and [4] whether the movant acted in good faith." *Tancredi v. Metropolitan Life Insurance Co.*, 378 F.3d 220, 228 (2d Cir. 2004) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). The determination is within the discretion of the district court and is an equitable one based on the totality of the circumstances. *Id.*; *In re Veritas Software Corp. Securities Litig.*, 496 F.3d 962, 974 (9th Cir. 2007).

The court finds that there is excusable neglect warranting an extension in this case. As to the first factor, there is no danger of prejudice to the respondents here because they have been aware of the contested fee issue as early as 2004. Moreover, the respondents have pointed to no benefit gained by the movants from any delay in raising this issue, and indeed it appears that any delay has resulted in detriment, not benefit, to the movants in that they are still awaiting compensation for their efforts. The second factor, the length of the delay and its potential impact on the proceedings, does not weigh against the movants. They moved in 2007 for the fees they now seek, but withdrew that motion without prejudice in an

---

[9]This part of the rule requires that after the fourteen-day deadline has passed, the court can, "on motion," exercise its discretion to extend the time. Although the movants did not file a formal motion requesting an extension of time, the court considers their reply to the respondents' arguments on this issue as constituting such motion. *See* [DE 1019, at 11-12]. The movants' reply addresses the issue of excusable neglect by pointing out that they filed their original application in 2007 before many of the individual claims had been resolved. *Id.* The respondents have had the opportunity to respond to that argument in their post-hearing submission. *See* [DE 1066, at 70-72].

attempt to resolve the issue without the help of the court.  While they did not renew the motion until two years later, they continued to perform their liaison and maritime counsel work during this time and it did not affect the quality of their representation.

The third and fourth factors, the reason for the delay and whether the movants acted in good faith, also weigh in favor of the movants because it is clear from the record that they were in negotiations with the respondents from early on in the litigation to resolve this issue without resort to judicial intervention.  Although the parties were not able to come to an agreement, there is no indication of bad faith or delay in bringing this motion once it became clear that they could not come to a resolution with the respondents.  The court therefore finds that even if Rule 54(d)'s timing requirements were not met, the court's interest in promoting judicial economy and extra-judicial resolution of such disputes and the movants' good faith in pursuing those goals compel the conclusion that any delay in filing the motion is due to "excusable neglect."

*          *          *          *          *          *

The court thus concludes that the question whether the movants in this case are entitled to any compensation for their work that benefitted other claimants in this litigation is easily answered in the affirmative.  In previous cases, as in this one, the harder questions are how that compensation should be calculated, which claimants should contribute to the compensation, and how much each claimant should be required to pay – questions to which the court now turns.

## II.    THE COMPENSATION AWARD

### A.    The Formula to Be Used

In cases such as this, the court has essentially two choices concerning the determination of fees.  *See generally McDaniel v. County of Schenectady*, 595 F.3d 411, 417-18 (2d Cir. 2010); *Davis v. Eastman Kodak Co.*, 758 F. Supp. 2d 190, 194 (W.D.N.Y. 2010).  The "lodestar" or "presumptively reasonable fee" method computes the fees by determining the number of hours reasonably expended on work that benefitted the group and multiplying that by a reasonable hourly rate.  The "percentage of fund" method determines the fee by

taking a percentage of the recovery obtained through the efforts of counsel that benefitted the group. *Davis*, 758 F. Supp. 2d at 194-95.

The lodestar method should be employed here for several reasons. First, it more accurately focuses on the benefit actually conferred on the claimants by the work of the movants. Unlike class actions, where the efforts of lead and liaison counsel typically result in the creation of a common fund from which a percentage may be extracted to pay their fees, the efforts of lead and liaison counsel here only established liability. The efforts of the movants thus did not create a common fund from which a fee could be extracted, nor did it end the litigation. Rather, counsel for the claimants were required to perform varying degrees of further work necessary to establish the individual claimants' cases on damages.[10]

Moreover, simply setting a percentage of each claimant's recovery, as the movants seek, would ignore important differences in the benefits the various claimants actually received from the movants' efforts. Some claimants settled their claims before the movants performed any substantial work for the group as a whole. Others settled their cases at various points on the way through the summary judgment proceedings, the successful trial on papers, and the successful appeal. Efforts by the movants after a claimant had settled would not have benefitted that claimant. Because the court concludes that the amount paid by a claimant's attorney toward the movants' fees should at least approximate the amount of benefit conferred on the claimant, the lodestar method permits the court to assess, within limits, how much benefit had been conferred on different groups of claimants at the point when their claims were resolved. Similarly, as explained more fully below, the use of the lodestar permits the court to take account of the fact that the movants themselves reaped

---

[10] Distinctions are occasionally drawn between "common fund" cases and "common benefit" cases. In the common fund cases, a successful plaintiff creates, preserves or increases a common fund that is shared by others. In the common benefit cases, a successful plaintiff secures a result that confers a benefit on a group who should share the expense of securing it; for instance, the benefit may be the establishment of liability on the merits before a determination of damages. *See Pawlak v. Greenawalt*, 713 F.2d 972, 981-83 (3d Cir. 1983). This case more closely resembles a common benefit case. The movants obtained a liability judgment that created the basis for damages recoveries by the individual claimants.

benefit from their work since they represented clients from whom they obtained fees based on the ultimate outcomes of the damages claims made by their clients. Finally, the court cannot ignore the fact that the matter of fees was not bargained for at the outset when the attorneys could have agreed upon a formula for setting the fees, including a percentage formula, and if unable to agree, could have submitted competing proposals for the court's review. For the court now to set an arbitrary percentage of each claimant's recovery as the fee to be paid, without regard to the value of the efforts of the movants, could result in the perception that the movants had reaped a "golden harvest of fees," a result which the lodestar method was created to avoid. *See McDaniel*, 595 F.3d at 418.

To calculate the lodestar in this circuit, the court is charged with deciding the "presumptively reasonable fee" for the work performed in the case. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008). The first step in this process is for the court, in the exercise of its considerable discretion, "to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." *Id.* at 190 (emphasis in original); *accord, McDaniel,* 595 F.3d at 420. In determining this "reasonable hourly rate" the court is to be guided by what a paying client would be willing to pay, keeping in mind that a reasonable paying client would wish "to spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 522 F.3d at 190. The court then calculates the "presumptively reasonable fee" by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate. *Id.*; *see also Hensley*, 461 U.S. at 433. To facilitate this analysis, the Second Circuit has required that attorneys applying for court-ordered compensation document the application with contemporaneous time records specifying, for each attorney, the date, the hours expended, and the nature of the work done. *See New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147-48 (2nd Cir. 1983). Where adequate records are not submitted, the court may deny fees altogether or reduce the award. *See Carey*, 711 F.2d at 1148; *Private Sanitation Union Local 813, Int'l Bhd. of Teamsters v. Gaeta-Serra Associates, Inc.*, No. 02–CV-5526, 2005 WL 2436194, at *3-4 (E.D.N.Y. Aug. 12, 2005). In

addition, the court may exclude hours that it finds to be excessive, duplicative, or unnecessary. *Duke v. County of Nassau,* No. 97-CV-1495, 2003 WL 23315463, at *1 (E.D.N.Y. Apr. 14, 2003) (*citing Hensley,* 461 U.S. at 434; *Luciano v. Olsten Corp.,* 109 F.3d 111, 116 (2d Cir. 1997)).

Calculation of the lodestar in this action poses several difficulties. First, although maritime counsel, the Dougherty Ryan firm, kept the required contemporaneous time records reflecting hours expended and tasks performed, liaison counsel, Anthony Bisignano, did not. Ordinarily this might disable the court from making any award for time spent by Bisignano. In *Carey*, the Second Circuit established the rule that attorneys seeking court-ordered compensation "must document the application with contemporaneous time records." 711 F.2d at 1148. Over time, the rule was applied with varying degrees of rigor such that the absence of contemporaneous records often resulted in substantial reductions to fee awards but were not always fatal. *See, e.g., Alleyne v. Time Moving & Storage Inc.,* 264 F.R.D. 41, 59-60 (E.D.N.Y. 2010) (in statutory fee-shifting case, objections by class members to percentage fee award rejected even though counsel did not keep contemporaneous time records); *Monaghan v. SZS 33 Assocs., L.P.,* 154 F.R.D. 78, 83-84 (S.D.N.Y. 1994) (recognizing that failure to keep contemporaneous time records by attorney in personal injury case contravened *Carey*, but ruling that the failure was not unreasonable in the circumstances and reducing the number of hours in reconstructed time records by 30% "in the interest of equity"); *Johnson v. Kay,* 742 F. Supp. 822, 837 (S.D.N.Y. 1990) (awarding counsel fees on the basis of affidavits reconstructed from contemporaneous records).

Recently, however, the Second Circuit has reiterated, in no uncertain terms, that *Carey* established "what is essentially a hard-and-fast-rule from which attorneys may deviate only in the rarest of cases, and that any deviations from the rule must be based on circumstances expressly found by the awarding court, in the first instance, to merit such deviation." *Scott v. City of New York,* 643 F.3d 56, 57 (2d Cir. 2011) (internal quotations and citations omitted). Thus, after *Scott*, and consistent with that decision, courts have awarded discounted fees to attorneys who failed to maintain contemporaneous time records where the court has

determined that exceptional circumstances were present. *See, e.g., Pineda-Herrera v. Da-Ar-Da, Inc.*, No. 09–CV–5140, 2011 WL 2133825, at *8 (E.D.N.Y. May 26, 2011) (in statutory-fee shifting case, counsel's misguided belief that he was not required to keep records "justifies a one-time limited exception to *Carey*, with substantial discounting to deter future violations"). In *Pineda- Herrera*, the court relied on the Second Circuit's holding that "docket entries and other official, contemporaneous records of an attorney's court appearances could, in the discretion of the trial judge, justify an award for the time reflected therein." 2011 WL 2133825, at *8 (citing *Scott*, 643 F.3d at 59).

There are several reasons why Bisignano's failure to provide contemporaneous records should not be fatal to compensation for him in this case. It is worth noting that the cases establishing the "contemporaneous records" rule are statutory fee-shifting cases in which the liability for an attorney's fees is being imposed on an adversary. In such cases, it is appropriate to be exacting in requiring support for the fee being requested, because the payment obligation is being imposed on one who has received no benefit from the attorney's services. Here, of course, the opposite is true – payment is being sought from those who have been enriched by counsel's efforts, and who are simply being asked to pay over a relatively small portion of the amount by which they have been enriched to compensate counsel who helped make that possible. Moreover, because there is no statute prescribing a fee award here, unlike *Carey* and *Scott*, the court makes its fee award on the basis of equity, and should be guided by equitable principles. *See Monaghan*, 154 F.R.D. at 84 n.2 ("It must be remembered that this Court may award attorneys' fees solely on the basis of its inherent equitable powers.") (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)); *see also Hensley*, 461 U.S. at 437-38 & 438 n.13 (1983). Although contemporaneous time records are commonly relied upon in common benefit cases such as this, the court is aware of no precedent in this Circuit where the absence of contemporaneous time records has entirely barred an attorney in such a case from sharing in the fees obtained by those benefitted. Indeed, in equitable fund cases more often than not time records are used to calculate a lodestar simply as a cross-check against the percentage of the recovery that is afforded to lead counsel for their

efforts. *See Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 83 (2d Cir. 2010); (quoting *Goldberger*, 209 F.3d at 50 ("[W]e encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage.")); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (citing same). And in such cases, courts commonly apply multipliers to those lodestars such that fee awards of as much as four times the lodestars are not unusual. *See In re Telik, Inc. Securities Litigation*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *In re Interpublic Securities Litigation*, Nos. 02-cv-6527, 03-cv-1194, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) (approving 12% fee representing multiplier of 3.96 times lodestar and noting that multipliers between 3 and 4.5 had been common in federal securities cases) (citation omitted). Clearly, then, reliance on contemporaneous time records as a basis for determining a reasonable fee is much relaxed in cases of this nature, and the need for rigorous application of the contemporaneous records rule is therefore correspondingly reduced. *See Goldberger*, 209 F.3d at 50 ("where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court").

There are other reasons why rigorous application of the contemporaneous time records rule should not be required here. There is no question that the administrative functions liaison counsel performed in this case provided considerable benefit, not only to the other claimants, but to the court as well; without liaison counsel, the court would have been inundated with a cacophony of papers and arguments from numerous attorneys on even the most routine matters. Having appointed Bisignano to provide that service to the court, the court should not deny him any award by strictly applying the rule. His failure to keep time records is explained in part by the fact that his law practice is entirely devoted to personal injury work, an area of practice where time records are rarely kept by plaintiffs' counsel. Nor is there any indication that he has had previous experience serving in a lead or liaison counsel role where he may have learned of the need to keep adequate contemporaneous records to support an award of fees. Finally, it is worth noting that the

Second Circuit's strong pronouncement in *Scott* is quite recent; the efforts for which Bisignano seeks compensation occurred between 2004 and 2008, long before *Scott* was decided.

Finally, although Bisignano did not keep contemporaneous time records, the court is not without contemporaneous time records that substantiate his work.  The time records of the Dougherty Ryan firm contain countless references to Bisignano and the work he performed on specific days, and they conclusively demonstrate Bisignano's substantial involvement both in administrative matters, as well as in substantive matters throughout the briefing of the summary judgment motion, the preparation of the case for the trial on papers, the appeal, and post-appeal.[11]  In addition to maritime counsel's time records, the court has been provided with a wealth of documents – including e-mails and work product – which shed light on the nature and extent of the efforts that Bisignano undertook.  The docket entries of the court provide yet further contemporaneous records reflecting the numerous appearances Bisignano made on the case.  The court thus has both contemporaneous time records and other contemporaneous documentation upon which to base the calculation of a reasonable fee for Bisignano's efforts.  His failure to keep his own time records thus should not bar him from an award.  It does mean, however, that his efforts will necessarily be undervalued in establishing the lodestar.

Ultimately, then, the starting point for the court's determination of the lodestar are the contemporaneous time records maintained by the Dougherty Ryan firm.  The records are reasonably detailed, but suffer from a good deal of block billing, making it difficult in some instances to discern how much time was devoted to a given task.  Nevertheless, they provide a sufficiently particularized view of the progress of the litigation and of the efforts contributed to the common benefit, not only by maritime counsel, but by liaison counsel and other attorneys, such that the court has a sound basis for assessing the lodestar.  The

---

[11] The records are found at Exhibit H annexed to the Declaration of Richard Godosky In Support of the Motion for Attorneys Fees, April 17, 2009 [DE 954].

combination of the time records and other documents, coupled with the court's own experience, provides the basis for the conclusions reached below.

### B.    Compensation for Liaison Counsel

Under the Committee Order entered on September 30, 2004, the movant Anthony Bisignano was designated to serve as liaison counsel charged with a variety of responsibilities described with specificity in the Order.  Those responsibilities included (i) serving as a liaison between the claimants and the court; (ii) convening meetings of the claimants' counsel; (iii) receiving and distributing notice of court events to all counsel, and serving adversary counsel with papers concerning liability matters; (iv) coordinating the scheduling of depositions; (v) sending progress reports to all claimants' counsel and receiving communications from all claimants' counsel for distribution to the executive committee established by the Order; (vi) maintaining files regarding liability for the availability of all claimants; and (vii) administering a fund to which the claimants would contribute to meet liability expenses.  Although the order was not entered until September 30, 2004, pursuant to the court's instructions at the initial conference with the court on April 1, 2004, Bisignano had in fact been functioning as liaison counsel for a considerable period of time prior to the entry of the Committee Order, and was instrumental in the generation and dissemination of various drafts of both the Committee Order and the separate Case Management Order.  He should therefore be compensated for those efforts as well, since they benefitted the court and his fellow counsel in facilitating the progress of this action.  The court thus considers April 1, 2004 to be the appropriate starting date for determining the compensation he should be awarded for his efforts as liaison counsel.[12]

---

[12]Bisignano had already been playing a role in organizing the efforts of various claimants' attorneys prior to April 1, 2004.  Some of those efforts, which included arranging an inspection of the vessel, undoubtedly provided common benefits to those attorneys who participated.  But because Bisignano represented 43 claimants of his own, he had a strong personal interest in guiding the litigation to insure the best results for his clients.  Thus, until the court gave the imprimatur for the use of liaison counsel in this action on April 1, 2004, it is not appropriate to consider Bisignano's efforts that served the common interest before that date in setting the lodestar.

The time records and other documents submitted by the movants disclose considerable work by Bisignano in his role as liaison counsel. That work included (i) convening and conducting at least sixteen formal meetings of the claimants' counsel and the executive committee; (ii) drafting the Committee and Case Management Orders that were ultimately entered by the court; (iii) attending and speaking on behalf of the claimants at thirteen conferences with the court; (iv) attending the guilty pleas and other significant proceedings in the related criminal cases; (v) circulating important documents to all counsel, including drafts of papers filed with the court; (vi) providing status updates periodically regarding developments in the case; (vii) handling countless communications with claimants' counsel by e-mail and telephone; (viii) participating in discussions and other communications with opposing counsel; and (ix) administering funds contributed by the various claimants' counsel for expert fees and other litigation expenses. Set forth below are the court's determinations as to the time spent in connection with each of these tasks:

| | Task | Time (hours) |
|---|---|---|
| 1. | Meetings of Claimants' Attorneys[13] | 128 |
| 2. | Drafting Proposed Orders[14] | 40 |
| 3. | Court Conferences | 104 |
| 4. | Attending Criminal Proceedings | 12 |
| 5. | Circulating Documents | 20 |
| 6. | Status Updates | 36 |

[13]This determination, as well as the determination for court conferences below, assumes a total of eight hours per session taking into account not only attendance but also preparing for the session and assessing the results.

[14]The time records disclose that James Ryan and John Hession of the Dougherty Ryan firm contributed a substantial amount of time to the development of those orders. Compensation for that time is included in the compensation provided herein for liaison counsel, not in the award for maritime counsel.

| 7. | Other Communications with Claimants' Counsel[15] (e-mail/telephone/fax) | 150 |
| 8. | Communications with Opposing Counsel | 20 |
| 9. | Administering Litigation Fund [16] | 0 |

**TOTAL        510 hours**

Computing the appropriate compensation for those hours requires a determination of the reasonable hourly rate for the services rendered. Those services did not require highly specialized legal knowledge; nor did they pose particularly complex problems. Nevertheless, they required attention to all details of the litigation in order to anticipate the tasks that would be required of the claimants' attorneys, as well as the tasks that could be undertaken for the common benefit by the various committees of attorneys established by the Committee Order, and to then insure that those tasks were properly performed. In addition the services required more than the usual amount of organizational talent and communications skills. Finally, because of the seriousness of the claims and the numbers of claimants, the services provided by liaison counsel carried a high degree of responsibility. Taking those factors into account, as well as the court's own knowledge of the hourly rates charged by attorneys in this district, the court concludes that a fair assessment of the rate that clients would be willing to pay for the services provided by Bisignano in a case of this nature is $250 per hour.

---

[15]The record reflects that Bisignano sent a minimum of 82 e-mails to his fellow attorneys in his role as liaison counsel. Although a number of them were brief, a substantial portion plainly required time to gather information and to compose a concise explanation of the matters addressed. In addition, Bisignano's affirmation asserts, and the court accepts, that during times of high activity – specifically, preparation of the summary judgment motion, preparation of the record for the trial, and drafting the appeal – Bisignano experienced high volumes of telephonic communications from claimants' attorneys seeking information about the progress of those efforts.

[16]Hours for administering the Litigation Fund are not included in computing the lodestar. As the administration of the Fund was largely ministerial and probably accomplished by office staff rather than counsel, compensation for administering the Fund is measured as 10% of the total contributed to the fund. According to the summary of fund contributions and expenses submitted by the movants, total contributions came to $50,650. *See* Ex. 47.

### C.    Compensation for Maritime Counsel

As noted earlier, the Case Management Order designated John J. Hession and James E. Ryan of the law firm of Dougherty, Ryan, Giuffra, Zambito & Hession as Maritime Counsel on behalf of all of the claimants.  *See* Order dated August 29, 2004 [DE 431].  The Committee Order entered on September 30, 2004 confirmed that designation, charging them with the task of initiating and performing the work of the discovery and investigation subcommittees established by the Committee Order. [DE 734]

The contemporaneous time records submitted by Ryan and Hession in support of their motion are fairly detailed, but as noted above they suffer from "block billing" where multiple tasks are listed in a single entry that provides only the total number of hours devoted to all of the tasks.  Such billing deprives the court of information needed to assess how much time was devoted to specific tasks for which compensation should be provided, and the reasonableness of the time expended.  This failing is particularly significant in assessing compensation for efforts they contributed prior to the entry of the Committee and Case Management Orders, because at least some of the time listed in the time records was devoted to efforts in aid of their own client who was asserting a salvage claim entirely separate from the claims asserted by the personal injury claimants.  Other portions of their time were spent on organizational efforts such as drafting the above Orders which is taken into account in the computation above concerning the efforts of liaison counsel.  Nevertheless, maritime counsel deserve compensation for at least some of the time detailed in their time sheets during the period prior to September 2004 because the efforts they undertook to learn the facts and to research the law concerning the claims informed the later work they did in preparing and responding to discovery, in crafting the claimants' litigation strategy, and in coordinating and drafting the various affidavits, briefs and other legal arguments that were submitted during the course of the litigation.

The court has conducted a detailed, entry-by-entry review of the time records submitted by Hession and Ryan in an effort to determine the amount of time they devoted to the various tasks for which compensation should be afforded.  In analyzing the time

records, the court first divided the entries into time periods that correspond to significant events in the prosecution of the personal injury claims. The initial period from April 1, 2004 to June 1, 2005 was devoted primarily to initial investigative and discovery efforts. On June 1, 2005, a decision was reached by the executive committee to make a summary judgment motion that rested primarily on the guilty pleas that had been entered by the employees of the City who were responsible for the disaster. Thus, the period from June 1, 2005 to January 9, 2006 was devoted primarily to drafting and filing the summary judgment papers. On January 9, 2006, following a hearing on the motion before Judge Korman at which he suggested that a trial on papers would be a suitable means of deciding the issues raised by the motion papers, work turned to preparing the documentary record for such a trial. The period from January 9, 2006 to February 26, 2007 was devoted largely to that effort. Following Judge Korman's decision on February 26, 2007 holding that the City had breached its duty of care and that the breach caused the disaster, the movants became involved in defending the judgment on appeal. Thus, from February 26, 2007 to March 27, 2008, counsel were involved principally in drafting papers in opposition to the City's appeal. Finally, once the Second Circuit upheld the finding of liability on March 27, 2008, the movants provided work of common benefit in briefing various issues related to the anticipated trials on damages and in preparing presentations of evidence for those trials.

Annexed as Appendix A to this opinion is a spreadsheet reflecting the court's conclusions concerning the compensable hours devoted to various tasks undertaken by maritime counsel that served the common good. The Appendix sets forth the time reflected in maritime counsel's time records expended in eight categories of tasks divided by time period, as set forth above.[17] In identifying compensable time, the court excluded entries that

---

[17]The eight categories are as follows: (1) Discovery, which encompasses tasks relating to drafting and analyzing discovery requests and responses, as well as efforts directed to establishing a valuation of the vessel; (2) Summary Judgment, which encompasses the research and writing of the motion papers; (3) Trial, which encompasses the further factual investigation and preparation of papers for the trial on papers; (4) Appeal, which encompasses the research and writing on the opposition to the City's appeal; (5) Damages, which encompasses the work done on issues relating to damages; (6) Meetings, which includes the time spent preparing for and attending meetings of the

appeared to relate solely to the salvage claim that maritime counsel was then pursuing on behalf of their own client. (These entries appeared primarily in the earliest time period.) The court also excluded a modest amount of time devoted to purely ministerial tasks such as retrieving court records. Where, due to the "block billing" nature of the entries, a single entry included tasks that fell into more than one category, the court divided the hours reflected in the entry equally among the two or three categories under which the tasks fell. Thus, for example, in an entry for Ryan dated February 15, 2007 for 4.2 hours of time, the tasks were divided among three categories – one for work relating to the trial on papers, one for a meeting of the executive committee, and one for general work related to the case – with 1.4 hours apportioned to each category.

As reflected in the Appendix, the court has concluded that maritime counsel expended some 2,679.95 hours on work that served the common benefit.[18] Although the total number of hours devoted to some tasks appears initially to be high, particularly the hours spent on the trial, the critical importance of the issues justified the considerable expenditure of effort. This is especially true given that maritime counsel were opposed by extremely able counsel for the City. And, of course, the effort paid off with a successful result that was upheld on appeal. The court therefore finds no basis for determining that the number of hours reflected in the Appendix are unreasonable.

The court turns next to determining a reasonable hourly rate for the services of maritime counsel. In assessing that rate, the movants ask the court to consider that $432 per hour is the reasonable rate because that is the rate charged by Jeffrey Moller, an experienced maritime attorney whose billing records were among the exhibits filed in connection with

---

claimants' counsel and of the executive committee; (7) Conferences, which includes the time spent preparing for and attending court conferences and hearings; and (8) General, a catchall category which includes such things as general research, reviewing letters to the court and to other claimants' counsel, dealing with the press and attending proceedings in the related criminal cases.

[18]As maritime counsel's time records reflect a total of 2,926.5 hours for which compensation is sought, this figure represents an 8.4% reduction in compensable time.

this motion.[19]  The respondents, on the other hand suggest $210 per hour because that is a blend of rates that one of the claimants' attorneys was quoted when he sought assistance from a law firm with experience in maritime matters at the outset of the litigation before maritime counsel was appointed.

Although both proposed rates provide a backdrop for consideration of the issue, neither is the correct rate for establishing a lodestar.  The respondents' suggested rate is based on fees of $260 per hour for partner time and $160 per hour for associate time.  Here, Ryan and Hession are both partners in their firm, and both have extensive experience in maritime litigation.  There is no information about the relative experience of the attorneys who offered themselves at the $260 and $160 per hour rates.  Of even more significance, those rates were guaranteed compensation that would be paid for each hour of work.  By contrast, if maritime counsel had been unsuccessful in obtaining success in the litigation, their work would have gone mostly, if not entirely, uncompensated.

The rate suggested by the movants, on the other hand, is too high.  In determining the appropriate hourly rate, the court is bound to consider what a paying client would be willing to pay to litigate the case effectively but at the least cost.  Here, given the prospect that a large fee would ultimately be paid, a paying client would have bargaining leverage to obtain a discount from the customary hourly rate charged by a law firm.  It is, of course, impossible to know what maritime counsel and the respondents would have negotiated concerning fees if they had addressed the issue at the outset of the relationship, given the possibility that a lack of success by maritime counsel would likely result in little or no fee.  Putting aside the contingent nature of the relationship, however, a paying client with a prospect of obtaining in excess of $87 million[20] in damages would probably consider a fee of

---

[19]As explained below, Moller is a member of the Blank Rome law firm and contributed extensively to the briefing of the motion for summary judgment, the trial on papers and the opposition to the City's appeal.

[20]According to the City's records, which were provided to the court by Corporation Counsel, the personal injury claimants have received a total of $87,649,219 in awards for damages through both settlements and verdicts.

$350 per hour to be reasonable for attorneys with the experience enjoyed by maritime counsel. Such a fee would represent a 20% discount from Moller's customary hourly rate. The court adopts that hourly rate for assessing the lodestar.

### D. Compensation for Bisignano In Assisting Maritime Counsel

Although Bisignano was not appointed to serve as maritime counsel, the movants seek compensation for work he performed for the common benefit which assisted maritime counsel in the substantive work they performed. In his affirmations, Bisignano asserts that he performed countless hours of work in connection with the discovery process, the summary judgment motion, the trial on papers, the appeal, and in post-appeal work concerning damages issues. The time records of maritime counsel confirm Bisignano's involvement in all of those areas of their work. The difficulty, however, is in assessing the actual number of hours for which Bisignano should be compensated. As noted earlier, he himself kept no time records. The time records of maritime counsel are helpful, but they do not ascribe the amount of time spent on communications with Bisignano and do not always provide precision on the role Bisignano was playing in connection with maritime counsel's efforts. Moreover, to the extent that maritime counsel's time records reflect Bisignano's participation in substantive matters, at least a portion of his participation was attributable to his responsibility, as liaison counsel, to keep track of events in order to insure that appropriate progress was being made and to apprise the other claimants' attorneys about that progress. In that regard, his time is included in the estimates above concerning his communications as liaison counsel.

Thus, any estimates concerning the amounts of time spent by Bisignano on substantive activities that served the common benefit must necessarily be imprecise and rest considerably on the court's own experience. Nevertheless, the court is convinced that it is appropriate to make such estimates and include that work in calculating the lodestar because there is no doubt that Bisignano performed such work. Moreover, as set forth below, the court is affording some benefit to other claimants' counsel who assert that they too contributed to the efforts of maritime counsel but have no time records to substantiate the

hours they spent. Given the absence of records, however, the court must be very conservative and will undoubtedly understate the amount of time Bisignano actually spent.

The court's estimates are drawn primarily from the entries in maritime counsel's time records. Those records reflect that during the phase of the case that was concerned mostly with discovery, Bisignano participated in drafting and in responding to document demands, in reviewing discovery produced by the City, and in negotiating with the City to resolve disputed items of discovery. During that time period, he was also involved in the efforts of maritime counsel in producing a counter-valuation of the value of the vessel which would have been significant to establishing the limitation amount if the City had been successful. The court concludes that the movants should be afforded 24 hours of attorney time for Bisignano's efforts. During the phase of the case when summary judgment was being briefed, Bisignano played an active role in developing the plan for the motion and thereafter reviewed and provided input on multiple drafts of the moving papers. The time records do not, however, reflect that Bisignano actually drafted any portions of the brief. Accordingly, the court assesses Bisignano's contribution during this phase as 40 hours of time.

During the trial and appeal phases of the case, the records reflect a substantially greater contribution by Bisignano. Once Judge Korman suggested in early January that the parties consider conducting a trial on papers, Bisignano participated in identifying potential experts and selecting the experts who would provide affidavits. He was involved in strategic decisions concerning evidence to be submitted. He reviewed drafts of the various affidavits that were to be submitted by experts and provided comments concerning their content. He participated in preparing for and conducting depositions of the claimants' experts and of other witnesses. Finally, he reviewed and provided comments on the various drafts of the briefs that were filed to supplement the previously filed papers on summary judgment. The court concludes that Bisignano's contribution should be valued at 100 hours of time.

On the appeal, Bisignano participated in virtually all aspects of the effort. He assisted in outlining the briefing and actually drafted one of the three points in the claimants' brief in opposition. He participated in assembling the record on appeal. He reviewed and provided

input on various drafts of the papers that were prepared by maritime counsel and attorneys from the Blank Rome firm who also contributed to the effort. He participated in the pre-argument conference and assisted in mooting the argument prior to maritime counsel's appearance before the Second Circuit. The court places the value of those efforts at a minimum of 70 hours.

Finally, once Judge Korman issued his decision finding the City negligent, Bisignano coordinated efforts related to the anticipated damages trials. These included obtaining photographs and assembling a multi-media presentation, as well as reviewing briefs submitted to the court on various legal issues. An award of 16 hours is appropriate for those efforts.

Although he is an experienced attorney Bisignano does not enjoy the same level of experience in maritime matters as maritime counsel. Accordingly, the hourly rate at which his efforts should be valued ought to be lower than the hourly rate set out above for maritime counsel. The court concludes that in evaluating the lodestar, the reasonable rate for his efforts is $300 per hour.

### E.  Adjustments to the Lodestar

When using a lodestar approach for determining compensation for attorneys who have performed work that conferred a common benefit on a group of plaintiffs, courts customarily consider whether a multiplier should be applied to the lodestar to account for "less objective factors" that may be taken into consideration in setting an appropriate fee. *E.g., Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999); *accord, McDaniel*, 595 F.3d at 423. The factors to be considered, commonly referred to as the "*Goldberger* factors," include "(1) counsel's time and labor; (2) the litigation's magnitude and complexity; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *McDaniel*, 595 F.3d at 423 (quoting *Goldberger*, 209 F.3d at 50).

Several of the *Goldberger* factors have already been taken into account in setting the reasonable hourly rate and are therefore not reconsidered here. However, two of the factors

– risk of the litigation and the requested fee in relation to the settlement – warrant discussion. Because the movants would have been unlikely to obtain compensation for their efforts from the claimants' counsel if they had not prevailed in defeating limitation and gaining a finding of liability, there was at least some risk that the efforts they undertook would go unrewarded. The risk was substantially reduced, of course, by the guilty pleas that were entered by several City employees prior to the time that the movants undertook the majority of their work. Nevertheless, the movants are entitled to some multiplier to account for the risk. Similarly, given the total amount of settlements and verdicts that were attributable at least in part to the movants' efforts, as discussed in more detail below, the movants are entitled to a modest multiplier based on that factor as well.

The movants also ask the court to include in any award an amount to cover the attorneys' fees they have incurred in litigating this motion as well as an award of prejudgment interest. As to their fees on this motion, the movants assert that a substantial amount of attorney time has been expended in connection with their application for fees, and request that the court take this into consideration in determining the amount of their overall equitable compensation. For the same reason as they are entitled to fees for their role as liaison counsel, the movants are entitled to reasonable counsel fees for the costs of litigating the fee application motion. As discussed above, the purpose of granting fees to the movants here is to encourage counsel to take on the considerable responsibilities of serving as liaison and maritime counsel for the common benefit. To deny them fees for the expenses they had to undertake to ensure that they received appropriate compensation would encourage objectors to raise meritless objections to a request for fees. *See Cole v. Hall*, 376 F. Supp. 460, 462 (E.D.N.Y. 1974) ("The challenge to his fee is a matter of public concern and it is in the public interest that he be compensated for the services rendered in the protection of his fee."); *see also Cruz*, 34 F.3d at 1161 n. 9 (noting that on remand the plaintiff's counsel "may well be entitled to receive compensation for the reasonable amount of time spent in preparing the plaintiff's fee application."). *C.f. Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979) ("denying attorneys' fees for time spent in obtaining them would dilute the value of a

fees award by forcing attorneys into extensive, uncompensated litigation in order to gain any fees.") (citation and internal quotation marks omitted).[21]

In support, the movants have submitted a declaration by their counsel, Godosky & Gentile, PC, asserting that their contingency agreement with the movants provides for a fee of 25% of the gross recovery here. Decl. of A. Gentile, Esq., Nov. 23, 2010, ¶ 4 [DE 1064-2]. Mr. Gentile estimates that the movants have incurred approximately 1,000 hours of work in their various applications for attorney's fees. Mr. Gentile provides a breakdown of the time spent by providing a general description of the type of work or application to the court, the attorneys who worked on the application, and the total number of hours. For example, the first two entries state:

> The original motion for fees filed on June 20, 2007, was researched and prepared by James Ryan and Anthony Bisignano. This entailed the collection of documents supporting the motion, extensive research, drafting factual affidavits as well as a memorandum of law. This effort alone comprised *150 hours* of work.
>
> Intake of file, file review by Godosky & Gentile. *35 hours*

Gentile Decl. ¶ 6. The declaration does not attach contemporaneous time records indicating the dates on which the work was performed or time spent on specific tasks by specific individuals. It also does not propose an hourly rate. Indeed, rather than propose a specific monetary award for the fee application effort, the movants propose that the court "consider

---

[21]There is also no danger that the award of fees for the fee application would harm the claimants' interests in a common benefit case like this one. In *Pawlak v. Greenawalt*, the Third Circuit held that, in a non-statutory fee case, the costs of litigating disputes about fees would be awarded in common benefit cases but not common fund cases. 713 F.2d at 982-83. The distinction was due to the fact that in a common fund case, the award of such a fee would deplete the plaintiff's recovery. On the other hand, in the common benefit cases, the additional cost would not affect the plaintiff's net recovery, but rather comes out of their attorney's recovery. Likewise, in *Donovan*, the Second Circuit also found that unlike in common fund cases, there was no conflict of interest between an attorney and his client in a common benefit case because the fund would not be depleted by an award of attorney's fees. *Donovan v. CSEA Local Union 1000, American Federation of State, County and Municipal Employees, AFL-CIO*, 784 F.2d 98, 106 (2d Cir. 1986).

the roughly 1,000 hours of work performed in prosecuting the instant fee application as a factor in establishing the compensation to which Movants are entitled." [DE 1064, ¶ 267].

As noted above, the Second Circuit requires that a request for attorney's fees be accompanied by contemporaneous billing records for each attorney, and where adequate records are not submitted, the court may reduce the award or deny fees altogether. *See Carey*, 711 F.2d at 1148; *Gaeta-Serra Associates, Inc.*, 2005 WL 2436194, at *3-4. The movants have not satisfied the contemporaneous time record requirement. The declaration submitted submitted by the movants sweeps weeks and months of work by various individuals into single categories. Although this is presented only as "a good faith estimate," and Mr. Gentile offers "a more detailed accounting" should the court require one, there is no indication that contemporaneous time records were kept. The failure to keep contemporaneous time records or provide them to the court prevents the court from basing an award on the 1,000 hours of time spent on this motion (at some unspecified hourly rate). Even in the absence of contemporaneous time records, however, the court is inclined to exercise its discretion to provide the movants with some compensation for the time spent litigating the fee application on an equitable basis. *Cf. Goldberger*, 209 F.3d at 50; *Gagne*, 594 F.2d at 344; *Cole*, 376 F. Supp. at 462. Indeed, the movants perhaps anticipated this since they have not asked the court to actually award them a specific amount for these fees, but rather to somehow take their time into account in the fee determination. After having reviewed the record of this motion, involving several rounds of briefing and a two-day hearing before the court, the court recommends that the lodestar should be increased by 10% to take into account the fees incurred in litigating the fees issue.

As to prejudgment interest, the movants have offered precious little legal support for making such an award. Although Congress has enacted a statute governing the award of post-judgment interest in federal cases, 28 U.S.C. § 1961, it has not enacted a similar statute for prejudgment interest. As explained by the Supreme Court, absent a statute mandating it, the decision whether to allow prejudgment interest rests within the discretion of the district court and "depends upon the circumstances of each case." *Dyer v. National Steam Nav. Co.*

*(The Scotland)*, 118 U.S. 507, 518-19 (1886); *see also Jones v. Spentonbush-Red Star Co.*, 155 F.3d 587, 593 (2d Cir. 1998). As a result, the federal courts have awarded prejudgment interest in certain categories of cases as an element of fair compensation. *City of Milwaukee v. Cement Division, National Gypsum Co.*, 515 U.S 189, 197 (1995) ("prejudgment interest is not awarded as a penalty; it is merely an element of just compensation"). And the Second Circuit has held that, as an element of just compensation, prejudgment interest should be awarded in admiralty cases absent exceptional circumstances (like a plaintiff's delay in bringing suit). *Jones*, 155 F.3d at 593; *City of Milwaukee*, 515 U.S. at 195 (citing cases); *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 310-11 (2d Cir. 1987).

The movants' reliance on admiralty cases as the basis for the award of prejudgment interest on their fee claim, however, is misplaced. The cases cited in their papers relate to prejudgment interest on liability damages awards, not on attorney's fees for counsel. The court has concluded that in the interest of equity, the movants here should be compensated for their work as liaison and maritime counsel. Had the movants contracted for that right to compensation and were forced to bring this lawsuit to recover it, perhaps prejudgment interest would be warranted. Instead, however, the issue of attorney's fees was not raised by either party until late in the litigation. As the facts before the court now stand, the court concludes that the movants would be fairly compensated by the award of attorney's fees alone and that any additional award of prejudgment interest on the fee award would amount to a penalty.

### F.    Offsets

It is not disputed that liaison and maritime counsel contributed more extensively to efforts that benefitted the claimants as a group than any other counsel. Several other attorneys have argued, however, that they too contributed to such efforts and that, if liaison and maritime counsel obtain contributions of fees from other counsel, they too should receive compensation in the form of offsets against any amounts they are required to contribute to the movants' compensation. Evidence was offered at the hearing concerning

the efforts undertaken by three firms that benefitted the claimants as a group – Blank Rome, The Cochran Firm, and Weissman & Calderon.

Of the three, Blank Rome contributed the most extensively, by far, to the group effort. Jeffrey Moller of that firm spearheaded the firm's efforts, and maritime counsel consulted extensively with Moller concerning various aspects of the summary judgment motion as well as the ensuing trial on papers that resulted in the judgment in favor of the claimants. He also contributed to the defense of the judgment on appeal to the Second Circuit. Moller and his firm were heavily involved in developing the factual record as well, including the depositions and the submission of expert reports. Throughout the work, James Ryan of the Dougherty Ryan firm directed the effort and delegated to Blank Rome the tasks they undertook. According to detailed timesheets kept by the Blank Rome firm, Moller himself expended about 530 hours of work on the matter, of which 98 percent, in his estimation, related to the maritime issues (as distinguished from damages issues relating specifically to the firm's clients) that were the subject of the motion, trial and appeal. Ex. ZZ. It appears from a review of the timesheets that others who assisted Moller on maritime issues contributed perhaps 150 to 200 additional hours of effort.[22] *Id.*

Blank Rome has made no motion for an award of fees, although they may well have been entitled to obtain an award. Had they done so, their compensation would have been added to the amount awarded to the movants below, thus increasing the proportionate share that everyone else would have had to contribute. As the value of Blank Rome's efforts for the common benefit far outstrips the proportionate share of the award they would otherwise be required to pay under the formula set forth later in this opinion, the firm should be absolved from making any contribution to the movants' compensation.

Derek Sells of the Cochran Firm contributed research and writing that was included in the briefing on the claimants' summary judgment motion. Specifically, Sells handled the argument that the guilty plea of the City's Director of Ferry Operations, Patrick Ryan, should

---

[22]The amount of time spent by Blank Rome confirms the court's conclusion that the time spent by maritime counsel was reasonable.

be given collateral estoppel effect on various issues affecting the City's liability for the crash. The argument was one of a number of points made in the briefing, but was ultimately not successful. In addition, maritime counsel's time records reflect that Sells reviewed the briefs and conferred with maritime counsel on several occasions concerning the papers. Sells did not keep timesheets or other billing records concerning his work, but estimated that he devoted between 200 to 250 hours to the issue. Having reviewed the briefs, I conclude that the estimate is considerably exaggerated. Between the initial and reply briefs, the argument consists of approximately twelve pages of straightforward analysis dealing with an issue that is well-developed in the law. Given the absence of time records, the court concludes that The Cochran Firm should be given a credit for 50 hours of work at $300 per hour, the same rate at which Bisignano's efforts are being compensated, which should be offset against the amount the firm is required to pay.

Finally, Deon Sankar of the firm of Weissman & Calderon contributed some research that was included in the reply brief filed by the claimants on their summary judgment motion. The research involved a relatively obscure evidentiary issue, the admissibility of internal rules of conduct adopted by an employer on the issue of negligence. On relatively short notice during the preparation of the reply brief, Sankar found a New York Court of Appeals case that was relevant to the issue and drafted two pages of argument that he forwarded to maritime counsel. Although the argument that was included in the reply brief differed considerably from that drafted by Sankar, the reply brief relied heavily on the case, and the case was ultimately cited by Judge Korman in the Memorandum and Order he issued after the trial on papers. Because no timesheets or other billing records were submitted to substantiate the time spent by Sankar, I extrapolate, based on the two pages of written work Sankar provided to maritime counsel, that an award for eight hours of time is appropriate. Like Bisignano and Sells, Sankar is not a maritime lawyer, and his efforts should accordingly be valued at $300 per hour. An offset for $2,400 should be afforded against the amount to be paid by Weissman & Calderon.

The testimony by Sells and Sankar at the hearing also established that they and other members of the Executive Committee that was formed under the Committee Order devoted time to meetings of the Committee and discussions among Committee members concerning strategic decisions in the conduct of the litigation, and to review of the briefs and other papers submitted to the court. The court does not consider such time to be appropriately considered for offsets against the fees sought by the movants. There is no hard evidence as to how much time any of the Committee members (other than liaison counsel and maritime counsel) actually devoted to those efforts. Perhaps more importantly, it is difficult to assess how much those efforts provided a joint benefit that all claimants realized, as distinguished from efforts that were necessary for counsel to undertake in service to their own clients. Predictably, the major participants in Executive Committee matters appear to have been the firms representing clients with the largest claims, and who were therefore understandably the most concerned about insuring that the limitation action was not successful in capping the funds available to compensate their clients. In contrast, the efforts of liaison and maritime counsel (and the efforts of Blank Rome, the Cochran Firm and Weissman & Calderon discussed above) provided clear, quantifiable benefit to the court and the claimants as a group which distinguishes those efforts from the more generalized activities of the Executive Committee.

## G. The Compensation Amount

Based on the discussion above, the court concludes that the lodestar for assessing the fees to be paid to the movants should be calculated as follows:

1.  For liaison counsel, 510 hours at $250 per hour, totaling $127,500;

2.  For maritime counsel, 2,679.95 hours at $350 per hour, totaling $937,982.50;

3.  For Bisignano's contributions to the work of maritime counsel, 260 hours at $300 per hour, totaling $78,000;

4.  For administration of the litigation expenses fund, $5,065.

Thus calculated, the lodestar comes to $1,148,547.50. In order to yield a total reasonable compensation for the movants' common benefit work, an adjustment upward should be

made by a multiplier in an amount discussed below and an additional 10% should be added for the litigation expense in making the instant motion.

## III.  FUNDING THE COMPENSATION

The traditional approach for funding compensation to liaison and lead counsel in common benefit cases is to collect a percentage of the individual recoveries obtained by the plaintiffs from the fees obtained by the attorneys who represented them.  *See Pawlak*, 713 F.2d at 982-83; *In re Zyprexa*, 467 F. Supp. 2d at 266-67.  That approach should be used here. The more difficult questions are deciding which of the recoveries should be included in the collection and how much each should be taxed.  The court's guiding principle for deciding those questions has been to adopt a system under which the amount contributed from each of the recoveries corresponds, as much as possible, to the benefit conferred by the movants toward achieving the recovery.

### A.  Who Should Pay

In this regard, the claimants who obtained recoveries by settlement prior to September 30, 2004 when the Committee Order was entered received little, if any, benefit from the efforts of the movants.  Indeed, because of the stay of discovery, those who settled before work began on the summary judgment motion in late May of 2005 received relatively little benefit from the movants' efforts.  Recoveries obtained prior to June 1, 2005 should therefore be excluded from any charge for attorneys' fees.[23]  Similarly, settlements in the amount of $50,000 or less likely received little benefit from the movants' efforts, and should be excluded.  The majority of such settlements occurred prior to June 1, 2005 in any event, and, because of the relatively modest nature of the claims, those that settled after that date were far less likely to be affected by the limitation proceeding.  Finally, because the Blank Rome firm is entitled to a complete offset against any charge, the $5 million settlement obtained by their client should also be excluded from computation.

---

[23]The total amount of recoveries obtained prior to September 30, 2004 was $1,852,550.  The total amount of recoveries obtained during the period from October 1, 2004 through May 31, 2005 was $1,472,549.

On the other hand, the recoveries obtained by the movants' clients should be charged to the same extent that other recoveries are charged. Doing so recognizes that the movants themselves profited from their efforts by obtaining fees from their clients, and there is no justification for, in effect, compensating them twice for those efforts.

Counsel for two crew members of the Ferry argue that they should be excused from contributing fees to the movants because of a conflict of interest between their clients and the rest of the claimants. Because they were members of the crew of the vessel, some of the claimants named them as defendants in their complaints against the City, and to that extent their interests conflicted with those of the other claimants. In recognition of that conflict, the court specifically excluded them from a provision of the Committee Order that required the claimants to contribute to the litigation expense fund described earlier in this opinion. But this apparent conflict should not excuse them from contributing to a fee award. As it turned out, the conflict did not materialize because claims against the crew members were never actually pursued by any of the claimants. Moreover, although the crew members were excused from contributing to the litigation expense fund, they were not otherwise excluded from the Committee and Case Management Orders and were included in various communications disseminated by liaison counsel during the course of the litigation. *E.g.* Exs. 33, 34, 40. More significantly, they received the benefit of the work provided by maritime counsel. They made no separate filings in connection with the summary judgment motion, the trial on papers, and the appeal. Rather they relied entirely on the movants for handling those aspects of the case, and received the full benefit of the liability findings that resulted from the movants' efforts, as verified by the fact that they did not settle their claims until June and August of 2009. Indeed, they were among the last claimants to settle.

The court has considered the argument that claimants who settled prior to February 27, 2007, the date when Judge Korman issued his decision denying limitation and finding negligence attributable to the City, should not be required to contribute to the movants' compensation because they obtained no benefit from the movants' efforts. There are at least two convincing answers to that argument. First, those claimants and the court had already

been receiving the benefits afforded by Bisignano in his role as liaison counsel entirely apart from any efforts contributed by maritime counsel, and they should therefore contribute to compensation for his efforts.  Second, the prosecution of the summary judgment motion and the trial on papers was advancing the litigation during those time periods.  If the movants had not undertaken those efforts, the attorneys for the claimants who settled during that period would have had to devote time and effort to the case.  The efforts of the movants thus freed up counsel's time to handle other cases from which they could earn fees.  In that respect alone they obtained considerable benefit from the movant's efforts in defending the limitation action and prosecuting the claimants' negligence claims.  The benefits to the claimants who settled prior to February 27 were less, to be sure, but that is recognized in the structure for contributing to the movants' compensation set forth below.  Because those claimants and their attorneys obtained benefits from the movants' efforts, they should not be exempt from making contributions.

For much the same reason the court rejects the argument that certain claimants received no benefit from the movants' efforts because the City's settlement offers to them remained unchanged after the decision denying limitation was rendered.  One cannot say with certainty what would have happened if the decision had gone the other way, but logic compels the conclusion that the offers would most probably have been reduced.  In that sense alone, those claimants certainly received a benefit from the movants' efforts.  On the other hand, the court *can* say with a great deal of certainty that if *no* opposition to the limitation petition had been offered, most if not all of the settlement offers would have been downwardly affected, and thus all claimants who had substantial claims benefitted from the movants' efforts.  And the attorneys representing those claimants certainly obtained the benefit of not having to expend their own time and effort opposing the limitation action, time and effort they were able to direct (presumably profitably) to other matters.

Nor should claimants whose offers did not change after the denial of limitation receive a downward adjustment of their contribution.  Determining all of the factors that led to how and when each claimant decided to reach agreement with the City is an impossible

exercise. No contribution system will be able to assess precisely the benefit conferred on any given claimant, and some level of arbitrariness is inevitable. Thus, some will inevitably believe they are contributing more than their "fair share." But if the court were to begin making downward adjustments for some claimants, corresponding upward adjustments would be required of others to provide a fair compensation to the movants. Such an exercise is fraught with difficulties that can never be overcome to everyone's satisfaction, and therefore should not be attempted.

### B.     How Much Each Should Pay

Compensation to the movants should thus be funded by imposing a charge against the recoveries not excluded by the above considerations. To achieve a measure of correlation between the charges imposed and the benefits conferred by the movants' efforts, the percentages charged should be graduated depending on the time when the recoveries were obtained. Thus, those who settled earlier should be charged less because they benefitted less from the movants' work, while those who achieved their recoveries later by settlement or verdict should be charged more. As noted above in analyzing the work done by the movants, the majority of the benefits attributable to their work can be segmented into four fairly discrete periods: making the summary judgment motion, prosecuting the trial on papers, opposing the appeal, and post-appeal. Imposing the following graduated series of charges on recoveries exceeding $50,000 during those various periods yields a total of $1,581,061.56: 1% on recoveries obtained during the period when the summary judgment motion was being made (June 1, 2005 to January 8, 2006); 1.5% on recoveries obtained during the period when the trial on papers was being prepared and conducted (January 9, 2006 to February 26, 2007), 2% on recoveries obtained after the decision finding the City liable (February 27, 2007 to March 27, 2008); and 2.25% on recoveries obtained after the Second Circuit's decision on the appeal (March 28, 2008 to December 31, 2010).

Total compensation in the amount of $1,581,061.56 is a reasonable award for the common benefit work performed by liaison and maritime counsel. After deducting the 10% added for their attorneys' fees in making this motion, the actual total compensation is

$1,437,328.69.[24] That amount, when compared with the lodestar amount, reflects a multiplier of 1.25, which is at the lowest end of multipliers commonly applied in this circuit. *See, e.g. Carlson v. Xerox Corp., KPMG LLP*, 355 Fed. Appx. 523, 526 (in common fund case, approving 1.25 multiplier which district court recognized was below 3.1 median in similar cases); *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care L.L.C.*, 504 F.3d 229, 239, 249 (in common fund case, approving multiplier of 1.786); *In re Interpublic Securities Litigation*, 2004 WL 2397190, at *12. Compensation in the amount of $1,581,061.56 would be reasonable even if a portion of that number is *not* considered to be reimbursement of the movants' litigation expenses on this motion. In that event, the full $1,581,061.56 would represent only a 1.38 multiplier of the lodestar, still at the bottom end of common multipliers. When compared with the total amount of recoveries and settlements that are subject to the charges proposed above, that compensation figure is a mere 2.00% of the total recoveries.

The actual contributions by claimants' attorneys toward the award will of course be less than the total compensation amount set forth above. For one thing, the contributions attributable to the recoveries obtained by the movants' clients will simply be offset against the total compensation amount. In addition, the court is aware that some of the attorneys who would otherwise be required to contribute to the movants' compensation according to the above formula have already reached agreements with the movants concerning their contributions. Those agreements should not be disturbed.

## CONCLUSION

Accordingly, I recommend that the attorneys whose clients achieved recoveries exceeding $50,000 by settlement or verdict after June 1, 2005 be required to pay to liaison and maritime counsel a percentage of the total recoveries obtained by their clients in accordance with the percentages set forth above, depending on when their settlements or verdicts were finalized. The Blank Rome firm and any attorneys who have reached

---

[24]This amount is calculated by use of the mathematical formula, $x + 0.1(x) = \$1,581,061.56$, where $x$ is the amount of compensation before the addition of 10% for attorneys' fees.

agreements with liaison and maritime counsel concerning the fees they were to pay should of course be exempt from making such payments. In addition, The Cochran Firm and Weissman & Calderon should be permitted to deduct the offsets discussed above from the amounts they would otherwise owe .

*     *     *     *     *     *

Any objections to the report and recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this opinion. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this report and recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2nd Cir. 2002); *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully recommended,

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:    Brooklyn, New York
          December 2, 2011